FILED
2014 Mar-27  PM 04:21
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| RENARD MARCEL DANIEL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CV 12-2526-IPJ-JEO |
| | ) | |
| | ) | |
| KIM T. THOMAS, COMMISSIONER, | ) | |
| ALABAMA DEPARTMENT OF | ) | |
| CORRECTIONS, | ) | |
| | ) | |
| Respondent. | ) | |

## <u>MEMORANDUM OPINION</u>[1]

This action seeks habeas corpus relief from Petitioner Renard Marcel

Daniel's state court conviction and death sentence on a charge of capital murder.

*See* 28 U.S.C. § 2254.

## <u>FACTUAL BACKGROUND</u>

## I.     THE OFFENSE

---

[1] References to the court record are designated "C.R." The court will strive to list any page number associated with the court records by reference to the numbers at the bottom of each page of a particular document, if those numbers are the most readily discoverable for purposes of expedient examination of that part of the record. Otherwise, the page numbers that are referenced will correspond to those printed in the upper right hand corner of the record. Additionally, if there is an easily identifiable tab number close to any cited material, the Court has made reference to that for the reader's benefit.

The Alabama Court of Criminal Appeals ("ACCA"), in its opinion on direct appeal, set out the relevant facts of the case as follows:

The evidence showed that, in September 2001, the victims, Loretta McCulloch and John Brodie, had been dating for approximately five years and were preparing to move into an apartment together. The appellant lived in one of the other apartments, and George Jackson lived in another of the apartments.

Jackson testified that, on the evening of September 26, 2001, he went to the appellant's apartment, and they drank some beer and smoked a marijuana cigarette. That afternoon, they had seen the victims moving into the apartment next to the appellant's. Around 10:30 p.m., they decided to go next door and introduce themselves. At that time, the victims appeared to be very drunk.

The four played cards for a few minutes. At some point, Brodie used the words "brother" and "nigger" while talking to the appellant, and the appellant became upset and "started raising Cain." (R. 198-99.) The victims both apologized, and Jackson tried to calm the appellant by telling him that the victims were drunk and did not mean anything. The argument continued for 5 to 10 minutes, and the victims asked the appellant and Jackson to leave. During the argument, the appellant pulled out a handgun and had it by his side, and McCulloch tried to get it from him and continued to tell them to leave.

Jackson testified that he and the appellant walked out of the apartment, that the appellant asked him for a cigarette, that he said the cigarettes must still be in the victims' apartment, and that McCulloch started holding the cigarettes and taunting the appellant with them. When McCulloch refused to give them to him, the appellant pulled the handgun up and said, "'Bitch, if you don't give me my cigarettes, I'm going to kill you.'" (R. 204.) Jackson tried to convince the appellant to leave, but the appellant refused. Jackson testified that he then went to the appellant's apartment to get his coat and keys; that, as he was leaving the apartment, he saw the appellant standing on the bottom steps

2

to the victims' apartment shooting into the doorway; that he heard four gunshots and saw fire coming out of the end of the handgun; and that the handgun looked like a .45 or a .380. The appellant then ran into his apartment, and Jackson went to his apartment. After he got to his apartment, Jackson heard McCulloch "hollering, 'Are you all right? Are you all right,'" and he then heard two more gunshots. (R. 208.) Subsequently, the appellant went to Jackson's apartment and said, "'George, I told you I'm a killer.'" (R. 248.)

Around 7:00 a.m. the next day, Jackson saw the appellant and said, "'Renard, please tell me you ain't killed those folks last night.'" (R. 210.) The appellant indicated that he had and that their bodies were in the doorway. He also "flashed" some bloody bullet cartridges and threw them into the garbage dumpster. (R. 210.) Thereafter, Jackson told his mother and stepfather about the incident, and his stepfather reported the incident to law enforcement authorities.

Julie Farrow lived in the same apartment complex as the appellant, Jackson, and the victims. She testified that, between 10:45 p.m. and 11:00 p.m. on September 26, 2001, while she was taking her dog for a walk, she heard four gunshots in rapid succession. A few minutes later, she heard "a couple or three more" gunshots. (R. 295.) On cross-examination, she admitted that she had told law enforcement officers that the first gunshots were loud and that the subsequent gunshots sounded like they had come from a different firearm because they were not as loud.

K.V. Hill testified that his son was in the business of renting apartments, including those in the apartment complex where the appellant lived, and that he had hired the appellant to work for his son's business. He also testified that the appellant called him around 7:30 p.m. or 8:00 p.m. on September 26, 2001, to request an advance on his pay; that he refused the request; that the appellant called again between 10:30 p.m. and 11:30 p.m. and requested money; and that he agreed to let the appellant come by and get money because he said he did not have any food. After he arrived, the appellant talked for a while and asked if he could sit for a while after Hill went to bed because he did not have a

3

jacket, but he never asked for money. Finally, Hill identified a vehicle that the appellant had had towed to the apartments when he moved in.

James Logan, an evidence technician with the Birmingham Police Department, testified that, on September 27, 2001, he and other officers entered the victims' apartment and secured the scene. At that time, the victims were on the kitchen floor just inside of the door and there were footprints in what appeared to be blood on the kitchen floor. Logan testified that he collected eight shell casings, seven spent projectiles, one live round, beer cans and bottles, and two shoe impressions from inside of the apartment. Four of the spent projectiles were in the wall, and two were in the floor where the victims were. He also testified that it appeared that three of the projectiles that were in the wall had been fired by someone who was on the steps or the ground outside of the apartment door. He further testified that they found two shell casings outside of the victims' apartment; one shell casing in the dumpster to which Jackson referred; and a pair of tennis shoes in the trunk of the vehicle the appellant had had towed to the apartments. The tennis shoes were the same size as two other pairs of shoes officers found in the appellant's apartment.

Forensic testing revealed that the shoe impressions officers recovered were made by tennis shoes that were the same size and pattern as the tennis shoes officers retrieved from the trunk of the vehicle the appellant had had towed to the apartments. Also, DNA testing showed that blood on the right tennis shoe matched McCulloch's DNA profile. Finally, firearms and toolmarks testing showed that the projectiles and shell casings were fired from the same firearm and that that firearm was probably a .380 semiautomatic.

Autopsies revealed that the victims sustained several gunshot wounds and that they died as a result of those wounds. Brodie had a gunshot wound to the head that was made from a distance of three inches to three feet, and McCulloch had a contact gunshot wound to the head. Testing showed that Brodie's blood alcohol content was .32 and

4

McCulloch's was .17.[2]

The appellant testified that, on the evening of September 26, 2001, he and Jackson drank beer and smoked marijuana together and that Jackson suggested that they go meet Brodie and McCulloch. He also testified that, around 8:00 p.m. or 8:30 p.m., they went to the victims' apartment, stayed for 15-20 minutes, and decided to leave and return later to play cards; that they then went back to his apartment, drank some beer, and smoked more marijuana; that, between 9:15 p.m. and 9:45 p.m., they returned to the victims' apartment and played cards; that McCulloch and Jackson got into a fight after McCulloch made comments about Jackson; that Jackson threatened to hurt McCulloch; that Brodie attacked him; and that he heard a gunshot, turned toward Jackson, and heard more gunshots. The appellant further testified that Jackson shot McCulloch in the head and that she fell to the floor; that Jackson shot Brodie in the back, that Brodie fell to the floor and continued to move, and that Jackson grabbed Brodie's head and shot him in the head; and that he returned to his apartment. Finally, he testified that Jackson had a .380 semiautomatic handgun and that the tennis shoes officers recovered from the vehicle he had had towed to the apartments belonged to Jackson.

On cross-examination, the appellant admitted that he had previously told law enforcement officers that Jackson did not have a gun and that he did not think that Jackson was the type of person who would have committed the murders. He also admitted that he made three statements about the offense and that he did not mention Jackson as being the perpetrator in any of them. He further admitted that he had owned a .380 semiautomatic handgun at one time. Finally, he admitted that he had made numerous inconsistent statements about other details about his conduct and the murders.

Also, during its examination of Jackson and in its case-in-chief, the defense presented evidence about inconsistencies between the

---

[2] Both victims also had phenobarbital in their systems, for which Brodie had a prescription. C.R. Vol. 5, p. 552.

information Jackson had given law enforcement officers during their investigation of this case and his trial testimony. Finally, Donald Bass, Farrow's brother, testified that he had previously seen Jackson with a gun.

*Daniel v. State*, 906 So. 2d 991, 994–97 (Ala. Crim. App. 2004).

## II.   THE SENTENCE

After the formal sentencing hearing, the trial court found the existence of three statutory aggravating circumstances and no statutory mitigating circumstances.[3] C.R. Vol. 23, Tab 58, pp. 11–14. As to the statutory aggravating factors, the trial court found:

> The first aggravating circumstance pursuant to § 13A-5-49(1), the capital offense was committed by a person under a sentence of imprisonment was proven beyond a reasonable doubt. . . .

> The Court finds that the second aggravating circumstance as set out in § 13A-5-49(2), that the capital offense was committed after the Defendant had been convicted of another capital offense or a felony involving the use of violence to the person. . . .

---

[3] On direct appeal, the ACCA remanded the trial court's original sentencing order for several reasons. Initially, the trial court's sentencing order failed to make specific written findings concerning the existence or nonexistence of each aggravating circumstance, statutory mitigating circumstance, and nonstatutory mitigating circumstance. *Daniel v. State*, 906 So. 2d 991, 1001–02 (Ala. Crim. App. 2004). The trial court's original sentencing order also stated that "no additional evidence was presented to the Court as to what the punishment should be," even though Spencer Sims and Tammy Daniel testified at Daniel's sentencing hearing asking for life without parole. *Id.* at 1002. Additionally, in several places in its original sentencing order, the trial court referred to the Defendant's prior burglary conviction as burglary in the first degree instead of burglary in the second degree. *Id.* On remand to correct deficiencies in the original sentencing order, the trial court's amended order listed the aggravating circumstances detailed above and the ACCA affirmed the decision. *Id.* at 1004.

The Court finds that the third aggravating circumstance proven beyond a reasonable doubt was pursuant to § 13A-5-49(9), that the Defendant intentionally caused the death of two or more persons by one act pursuant to one scheme or course of conduct. . . .

*Id.* at 11–12. In regard to nonstatutory mitigating evidence, the trial court found:

The Defendant, during the sentencing phase before the Jury, offered the testimony of the Defendant's mother, Carolyn Daniel, who testified that the Defendant left home when he was 18 years of age. The Defendant had attention deficit disorder and was diagnosed with dyslexia, a learning disability, during elementary school. The learning disability forced him to drop out of school in the tenth grade. The Defendant's father died in 1978 and she remarried and the stepfather physically abused the Defendant, causing the loss of a kidney. The Department of Human Resources removed the Defendant when he was 12 years old and placed him in foster care for a year. When the Defendant was 16 years old he began the use of alcohol and drugs. She addressed the jury expressing sympathy to the families of the victims and her opinion as to her son's innocence.

. . . .

During the sentencing hearing before the Court, after the punishment phase before the jury, the State called Spencer Sims, the father of Loretta McCulloch, one of the victims, who asked the Court to sentence the Defendant to life without the possibility of parole as opposed to death.

Carolyn Daniel, the mother of the Defendant, was called and she apologized to the victims' families and asked the Court to have mercy on her son.

Tammy Daniel, the sister of the Defendant was called, who apologized to the victims' families and requested the Court to show mercy to her brother.

> This Court has considered the above non-statutory mitigating
> circumstances pursuant to § 13A-5-52.

*Id.* at 14–15. "After consideration of all the matters that were presented to" the court,

"the testimony heard at trial, the sentencing hearing before the jury, and the

sentencing hearing before" the court, and "both statutory and non-statutory mitigating

factors . . . ", the court found that "the aggravating circumstances outweigh the

mitigating circumstances and is [sic] sufficient to uphold the Jury's recommendation

of punishment by death." *Id.* at 15.

## PROCEDURAL HISTORY

On March 14, 2003, a jury found Petitioner Renard Marcel Daniel guilty of

capital murder for the offense of murder of two or more persons pursuant to one

scheme or conduct, in violation of Alabama Code § 13A-5-40(a)(10).[4] C.R. Vol.

23, Tab 58, p. 2. *See also* C.R. Vol. 7, Tab 15, pp. 883–84. The guilty verdict was

unanimous. *Id.* After granting Defense counsel a thirty–minute recess, the court

held a penalty hearing. *Id. See also* C.R. Vol. 7, Tab 15, p. 885. Following the

hearing, the jury recommended that Daniel be sentenced to death. Ten jurors voted

---

[4] The trial court listed the charge in Daniel's indictment as "Title 13A § 5-40-5(a)(9)." Daniel, however, was convicted under Alabama Code § 13A-5-40(a)(10) for the murder of two or more persons by one act or pursuant to one scheme or course of conduct. Ala. Code § 13A-5-40(a)(10). Alabama Code § 13A-5-40(a)(9), alternatively, prohibits murder in the course of first or second degree arson or murder by means of explosives or explosion. *See* Ala. Code § 13A-5-40(a)(9).

8

for the death penalty, and two jurors voted for life without parole. C.R. Vol. 23, Tab 58, pp. 4–5. *See also* C.R. Vol. 7, Tab 24, p. 922.

The trial court conducted a formal sentencing hearing as required by Alabama Code § 13A-5-47 on May 9, 2003. *Id.* at 5. *See also* C.R. Vol. 7, Tab 25, pp. 928–44. In accordance with the jury's recommendation, the trial judge sentenced Daniel to death. *Id.* Daniel's trial counsel declined to continue his representation. *Id.* at Tab 26, p. 945. The court appointed James Kendrick to handle Daniel's appeal. C.R. Vol. 14, p. 27, Order of June 26, 2003. Daniel filed a direct appeal in the ACCA. C.R. Vol. 9, Tab 28. The ACCA affirmed the trial court's ruling. *Daniel*, 906 So. 2d at 991; C.R. Vol. 23, Tab 59. The Alabama Supreme Court denied Daniel's petition for writ of certiorari on February 18, 2005. *See id.* On October 3, 2005, the United States Supreme Court denied Daniel's petition for writ of certiorari. C.R. Vol. 23, Tab 60.

On February 14, 2006, Daniel filed a Rule 32 post-conviction petition. C.R. Vol. 16, Tab 43. In the petition, Daniel argued ineffective assistance of trial and appellate counsel. *Id.* The State filed an answer and motion to dismiss largely arguing that Daniel's Rule 32 petition was insufficiently pleaded. C.R. Vol. 16, Tab 44. The trial court dismissed Daniel's petition finding, first, that the ineffective assistance of counsel claims were procedurally barred, because

9

appellate counsel had a transcript of Daniel's trial and could have raised

ineffective assistance claims on direct appeal. C.R. Vol. 14, p. 62, Order of July

31, 2006. The court also found that Daniel's Rule 32 petition largely failed to

plead facts with specificity that, had they been presented, would have resulted in a

different verdict. *See id.* pp. 4–5.

Daniel then filed a motion to reconsider, or in the alternative, leave to

amend. C.R. Vol. 17, Tab 45. After holding a hearing on Daniel's motion to

reconsider, the court vacated its order and allowed Daniel to amend his Rule 32

petition. C.R. Vol. 23, Tab 62. Daniel then filed an amended Rule 32 petition

largely arguing the same issues presented in his habeas petition. C.R. Vol. 17, Tab.

46. The trial court held oral argument on May 23, 2007 to decide whether an

evidentiary hearing was warranted on Daniel's amended Rule 32 petition. *See* C.R.

Vol. 14, p. 54.  Following oral argument, the trial court granted Daniel leave to file

a second amended Rule 32 petition. *Id.*; *see also* C.R. Vol. 11, Tab 36. The trial

court dismissed Daniel's Second Amended Rule 32 Petition and declined to hold

an evidentiary hearing. C.R. Vol. 14, p. 56. The trial court also denied Daniel's

motion for oral argument and motion to reconsider. C.R. Vol. 14, pp. 57–58.

Daniel appealed the trial court's Rule 32 denial to the ACCA. C.R. Vol. 19,

Tab. 49. The ACCA noted that the trial court's opinion found that Daniel raised

grounds that could have been raised at trial, but that the trial court denied Daniel's claims on alternative grounds as well. The ACCA affirmed on those alternative grounds. *Daniel v. State*, 86 So. 3d 405, 414–15 (Ala. Crim. App. 2011). Daniel filed an application for rehearing, which the ACCA denied on July 15, 2011. C.R. Vol. 23, Tab 66, Notice of July 15, 2011. The Alabama Supreme Court then denied Daniel's petition for writ of certiorari on Dec. 16, 2011. C.R. Vol. 23, Tab 67. The United States Supreme Court also denied Daniel's petition for writ of certiorari on October 1, 2012. C.R. Vol. 23, Tab 68. On July 24, 2012, Daniel filed the instant habeas petition. Petition for Writ of Habeas Corpus (doc. 1).

## THE SCOPE OF FEDERAL HABEAS REVIEW

Pursuant to 28 U.S.C. § 2254(a), a federal district court is prohibited from entertaining a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court" unless the petition alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In other words, this Court's review of habeas claims is limited to federal constitutional questions. Claims pertaining solely to "an alleged defect in a [state] collateral proceeding" or to a "state's interpretation of its own laws or rules" do not provide a basis for federal habeas corpus relief under section 2254. *Alston v. Dep't of Corr., Fla.*, 610 F.3d 1318, 1325–26 (11th Cir. 2010)

11

(citations omitted). Accordingly, unless otherwise expressly stated, use of the word "claim" in this opinion presupposes a claim of federal constitutional proportion.

## I.     EXHAUSTION AND PROCEDURAL DEFAULT

Under 28 U.S.C. §§ 2254(b) and (c), a federal court must limit its grant of habeas applications to cases where an applicant has exhausted his state remedies. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011). The purpose of this requirement is to ensure that state courts are afforded the first opportunity to correct federal questions affecting the validity of state court convictions. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (quoting *Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) ("Federal courts are not forums in which to relitigate state trials.")). Moreover, "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.'" *Id.* (quoting *Anderson v. Harless*, 459 U.S. 4, 5–6 (1982)).

"[A]n issue is exhausted if 'the reasonable reader would understand [the] claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271,

1286 (11th Cir. 2012) (quoting *Kelly v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)). If a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits, i.e., "the petitioner will have procedurally defaulted on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010). Moreover, "a state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (citation omitted).

Yet as the Eleventh Circuit has noted, a claim will only be procedurally defaulted in the following circumstance:

> [A] state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon "adequate and independent" state grounds. *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995) (citation omitted).
>
> We have "established a three-part test to enable us to determine when a state court's procedural ruling constitutes an independent and

adequate state rule of decision." *Judd*, 250 F.3d at 1313. "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Id.* Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. *See id.* Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied "in an arbitrary or unprecedented fashion." *Id.*

*Ward*, 592 F.3d at 1156–57 (footnote omitted).

The Supreme Court defines an "adequate and independent" state court decision as one which "rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment." *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)) (emphasis in original). To be "independent of the federal question," a state procedural rule "must rest solidly on state law grounds, and may not be 'intertwined with an interpretation of federal law.'" *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)). To be considered "adequate," the state procedural rule must be both "firmly established and regularly followed." *Kemna*, 534 U.S. at 376 (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)). This does not mean that the procedural rule must be rigidly applied in every instance, or that occasional failure to do so eliminates its "adequacy." Rather, the "adequacy" requirement means

14

only that the procedural rule "must not be applied in an arbitrary or unprecedented fashion." *Judd*, 250 F.3d at 1313.

There are also instances where the doctrines of procedural default and exhaustion intertwine. For instance, if a petitioner's federal claim is unexhausted, a district court will traditionally dismiss it without prejudice or stay the cause of action to allow the petitioner to first avail himself of his state remedies. *See Rose v. Lundy*, 455 U.S. 509, 519-20 (1982). But "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own procedural rules, a court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect." *Bailey*, 172 F.3d at 1305 (citation omitted).

## II.     EXCEPTIONS TO THE PROCEDURAL DEFAULT DOCTRINE

"[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749–50 (1991) (citations and internal quotation marks omitted). *See also Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one

who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.").

### A.     The "Cause and Prejudice" Standard

The "cause and prejudice" exception is framed in the conjunctive, and a petitioner must prove both cause and prejudice. To show cause, a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously. *Carrier*, 477 U.S. at 488. Examples of such objective factors include:

> . . . interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel. In addition, constitutionally ineffective assistance of counsel . . . is cause. Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default.

*McClesky v. Zant*, 499 U.S. 467, 493–94 (1991) (citations omitted). As for prejudice, a habeas petitioner must show "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

### B.     The "Fundamental Miscarriage of Justice" Standard

A petitioner may also escape a procedural default bar if he "can demonstrate

a sufficient probability that our failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). To make such a showing, a petitioner must establish that either: (1) "a constitutional violation has probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537–38 (1986) (quoting *Carrier*, 477 U.S. at 496), or (2) the petitioner shows "by *clear and convincing* evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323 (1995) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)) (emphasis in original).

## III.   RULES GOVERNING HABEAS CORPUS CASES UNDER SECTION 2254

### A.   28 U.S.C. § 2254(d) and (e)

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petitioner is only entitled to relief on a federal claim if he shows that "the state court decision was (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States'; or (2) 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Boyd v. Allen*, 592 F.3d 1274,

1292 (11th Cir. 2010) (quoting 28 U.S.C. § 2254(d)); *see also Alderman v. Terry*,

468 F.3d 775, 791 (11th Cir. 2006) ("[T]he 'contrary to' and 'unreasonable

application' clauses are interpreted as independent statutory modes of analysis."

(citation omitted)). Moreover, "[a] state court's factual findings are presumed

correct unless rebutted by the petitioner with clear and convincing evidence."

*Boyd*, 592 F.3d at 1292 (citing § 2254(e)(1)).

    A state-court determination can be "contrary to" clearly established

Supreme Court precedent in either of two ways:

> First, a state-court decision is contrary to this Court's precedent if the
> state court arrives at a conclusion opposite to that reached by this Court
> on a question of law. Second, a state-court decision is also contrary to
> this Court's precedent if the state court confronts facts that are
> materially indistinguishable from a relevant Supreme Court precedent
> and arrives at a result opposite to ours.

*Williams*, 529 U.S. at 405 (citation omitted). The Supreme "Court has held on

numerous occasions that it is not an unreasonable application of clearly established

Federal law for a state court to decline to apply a specific legal rule that has not been

squarely established by [the Supreme] Court." *Knowles v. Mirzayance*, 556 U.S. 111,

122 (2009) (citations and internal quotation marks omitted). Therefore, the proper

inquiry under the AEDPA "is not whether a federal court believes the state court's

determination was incorrect but whether that determination was unreasonable—a

substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citation omitted).

Finally, section "2254(d)(2) regulates federal court review of state court findings of fact; the section limits the availability of relief to 'decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Alderman*, 468 F.3d at 791 (brackets omitted) (quoting § 2254(d)(2)). And commensurate with the deference accorded to a state court's factual findings, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155-56 (alterations in original) (quoting § 2254(e)(1)). "This presumption of correctness applies equally to factual determinations made by state trial and appellate courts." *Bui v. Haley*, 321 F.3d 1304, 1312 (11th Cir. 2003) (citing *Sumner v. Mata*, 449 U.S. 539, 547 (1981)).

### B.    Procedural Rules Governing Habeas Corpus Cases Under § 2254

Because habeas corpus review is limited to review of errors of constitutional dimension, a habeas corpus petition "must meet [the] heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2(c)." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (citation omitted). "[T]he petition must 'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'"

*Mayle v. Felix*, 545 U.S. 644, 655 (2005) (quoting Rule 2(c) of the Rules

Governing Section 2254 Cases in the U.S. District Courts). The burden of proof is

on the habeas petitioner "to establish his right to habeas relief and he must prove

all facts necessary to show a constitutional violation." *Blankenship v. Hall*, 542

F.3d 1253, 1270 (11th Cir. 2008) (citation omitted). That is, to carry his burden, "a

petitioner must state specific, particularized facts which entitle him or her to

habeas corpus relief for each ground specified. These facts must consist of

sufficient detail to enable the court to determine, from the face of the petition

alone, whether the petition merits further habeas corpus review." *Adams v.

Armontrout*, 897 F.2d 332, 334 (8th Cir. 1990). *See Smith v. Wainwright*, 777 F.2d

609, 616 (11th Cir. 1985) (holding that a general allegation of ineffective

assistance of counsel is insufficient; a petition must allege specific errors in

counsel's performance and facts showing prejudice).

The court now turns to Daniel's specific claims with these principles in

mind.

## PETITIONER'S CLAIMS

## I.     GENERAL STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court

established the following two-pronged standard for judging, under the Sixth

Amendment, the effectiveness of attorneys who represent criminal defendants at

trial or on direct appeal:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687 (emphasis added). *See also Reed v. Sec'y, Fla. Dep't of Corr.*, 593 F.3d

1217, 1239-41 (11th Cir. 2010).

Because *Strickland*'s preceding two-part test is clearly framed in the

conjunctive, a petitioner bears the burden of proving both "deficient performance"

and "prejudice" by "a preponderance of competent evidence." *Chandler v. United*

*States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). *See also Holladay v.*

*Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must

be satisfied in order to show a violation of the Sixth Amendment, the court need

not address the performance prong if the defendant cannot meet the prejudice

prong, or vice versa."). Further, when assessing ineffective assistance of counsel

claims:

> [I]t is important to keep in mind that "in addition to the deference to counsel's performance mandated by S*trickland*, the AEDPA adds another layer of deference—this one to a State court's decision—when we are considering whether to grant federal habeas relief from a State court's decision." Thus, [a petitioner] not only has to satisfy the elements of the *Strickland* standard, but he must also show that the State "court applied *Strickland* to the facts of his case in an objectively unreasonable manner."

*Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010) (brackets in original

omitted) (citations omitted).

### 1.    The Performance Prong

In order to establish deficient performance, a habeas petitioner "must show

that counsel's representation fell below an objective standard of reasonableness."

*Strickland*, 466 U.S. at 688. That reasonableness is judged against "prevailing

professional norms." *Id.* Moreover, under *Strickland*, lower federal courts must be

"highly deferential" in their scrutiny of counsel's performance. As the *Strickland*

court outlined:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires

that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (citations and quotation marks omitted). Simply put, a habeas petitioner "must establish that no competent counsel would have taken the action that his counsel did take" to overcome the presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Chandler*, 218 F.3d at 1315 (citation omitted).

The reasonableness of counsel's performance is judged from the perspective of the attorney, at the time of the alleged error, and in light of all the circumstances. *See, e.g.*, *Newland v. Hall*, 527 F.3d 1162, 1184 (11th Cir. 2008) ("We review counsel's performance 'from counsel's perspective at the time,' to avoid 'the distorting effects of hindsight.'" (quoting *Strickland*, 466 U.S. at 689)).

### 2.    The Prejudice Prong

To satisfy the prejudice prong, a habeas petition "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of

the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Stated differently, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (citations and quotation marks omitted).

Further, the fact that counsel's "error had some conceivable effect on the outcome of the proceeding" is insufficient to show prejudice. *Strickland*, 466 U.S. at 693. Therefore, "when a petitioner challenges a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Strickland*, 466 U.S. at 695).

### 3.   Deference to the State Court's Findings

Because *Strickland* and § 2254(d) both mandate standards that are "highly deferential", "when the two apply in tandem, review is 'doubly so.'" *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011) (citations omitted). The inquiry is not then "whether counsel's actions were reasonable," but is instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

24

(citations omitted). The court must determine "whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* at 785.

An ineffective assistance of counsel claim presents "a mixed question of law and fact." *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001) (citation omitted). "State court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)." *Id.*

## II.   SPECIFIC CLAIMS OF TRIAL COUNSEL'S INEFFECTIVE ASSISTANCE

Daniel asserts seventeen claims of ineffective assistance of counsel during the penalty phase of his trial, eight claims of ineffective assistance of counsel during the guilt phase, and one claim of ineffective assistance of appellate counsel. Although some of the factual allegations and legal arguments supporting Daniel's claims overlap, the court will address each claim separately in the interest of clarity. The court proceeds in the order laid out in Mr. Daniel's habeas petition.

### A.   Ineffective Assistance of Counsel During Penalty Phase

#### 1.   Failure to Prepare for Penalty Phase

### a.    Procedural Default

Respondent argues that Daniel presents the following new factual allegations in support of his claim and that they are, therefore, procedurally barred from this court's review: "(1) the allegation that attorney Katheree Hughes, Daniel's trial counsel, 'had yet to investigate Mr. Daniel's background for mitigation evidence' at the conclusion of Daniel's trial, and (2) the allegation that counsel's 'failure to investigate resulted in the failure to present significant mitigation evidence, including the sexual abuse of Mr. Daniel as a child and his borderline mental retardation.'" Response p. 9 (doc. 16). As to Respondent's first claim, the court notes that Daniel's argument before the ACCA was that trial counsel was unprepared for the penalty phase. *Daniel*, 86 So. 3d at 428–29. Throughout his postconviction petition, Daniel alleged that trial counsel failed to produce mitigation evidence. By "unprepared", then, the court understands Daniel's argument to have been that trial counsel failed to investigate Daniel's background for mitigation evidence.  Given that Daniel alleged that Hughes was not prepared to proceed with the penalty phase of trial, the court finds that Daniel sufficiently presented the claim to the ACCA that Hughes had yet to investigate Daniel's background for mitigating evidence at the conclusion of Daniel's trial. As to Respondent's second claim, the ACCA specifically addressed Daniel's

contention that trial counsel was ineffective for failing to present evidence that he had been sexually abused by his stepfather. *Id.* at 430. Moreover, the ACCA addressed Daniel's argument that counsel was ineffective for failing to *explore* Daniel's possible mental retardation. *Id.* at 431. Accordingly, because the reasonable reader would understand these claims' particular legal basis and factual foundation to be the same as presented in state court, the factual claims are not barred from this court's review.

### b.  Merits

Daniel argues that the ACCA's denial of Daniel's claim that trial counsel was admittedly unprepared for the penalty phase was an unreasonable determination of facts and an unreasonable determination of the Supreme Court's ruling in *Williams v. Taylor*, 529 U.S. 362, 395 (2000). Daniel argues that in *Williams*, the United States Supreme Court "held that a one-week preparation for sentencing is deficient," and, therefore, Trial Counsel actually "*requested* a constitutionally inadequate amount of time to prepare." Reply Brief pp. 35–36 (doc. 23) (emphasis in original).

As to Daniel's claim that trial counsel admitted that he was unprepared for the penalty phase, the ACCA found that the claim was unsupported by the record. *Daniel*, 86 So. 3d at 428–29. The ACCA recited the record:

[Defense counsel]: My preference, Judge, would be to in order to get enough time to go through all the information we need to go through is to start first thing in the morning as opposed to this afternoon.

[The Court]: It's only 2:15. I'm not going to do that. We are going to have to go on this afternoon and proceed on.

[Defense counsel]: Well, can we get about 35 or 40 minutes before that?

[The Court]: I will give you about 30 minutes. . . .

*Id.* at 428–29 (quoting C.R. Vol. 7, Tab 15, p. 885). The ACCA concluded that "[d]efense counsel did not state that he was not prepared to go forward with the penalty phase. Daniel's claim is not supported by the record." *Id.* at 429. Further, noted the court, "[a]n allegation that is refuted by the record fails to state a claim and does not establish that a material issue of fact or law exists as required by Rule 32.7(d)." *Id.* (citation omitted). Because the ACCA found that Daniel failed to state a claim and failed to establish a material issue of fact or law, this ruling was on the merits and is subject to AEDPA review by this court. *See Borden v. Allen*, 646 F.3d 785, 822 n. 44 (11th Cir. 2011) (finding that ". . . [r]ather than find it insufficiently pled, the Court of Criminal Appeals summarily dismissed it under Rule 32.7(d) because it failed to present a material issue of law or fact. This dismissal was on the merits, and therefore subject to AEDPA review by this court.").

This court disagrees with Daniel's simplistic reading of *Williams*. While in *Williams*, the Supreme Court noted that the trial counsel did not begin to prepare for the sentencing phase until a week before the trial, the Court also noted that in that case counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood . . . ." *Williams*, 529 U.S. at 395. The Court further noted that had trial counsel adequately prepared for their client's sentencing hearing, "the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody." *Id.* Moreover, the testimony of the three witnesses in Williams's trial simply described "Williams as a nice boy and not a violent person." *Williams*, 529 U.S. at 369. Thus, trial counsel's deficiency did not merely lie in the amount of time they spent preparing for the defendant's sentencing hearing. Rather, the lack of preparation time resulted in trial counsel's failure to uncover and, therefore, present a wealth of potentially mitigating evidence.

That Daniel's attorney had only thirty minutes before beginning the penalty

phase of Daniel's trial was not in itself indicative of deficient performance given that counsel presented a significant amount of mitigating evidence to the jury. Carolyn Daniel, the petitioner's mother, testified that Daniel suffered from ADHD, was diagnosed with dyslexia, dropped out of high school in the 10th grade, that she and Daniel's father had separated, that Daniel's father died when he was a child, that Daniel suffered physical abuse from his stepfather (abuse so severe that she came home to find Daniel beaten and suffering from what the hospital later determined was a damaged kidney), that Daniel was subsequently removed from her home, that Daniel was separated from his siblings, that Daniel was moved to a boys' home where he stayed ten months, that Daniel thereafter returned to his mother's home, and that Daniel began using alcohol and marijuana at the age of 16. C.R. Vol. 7, Tab 20, pp. 895–902. Daniel's case differs drastically from *Williams* where the postconviction counsel uncovered a wealth of mitigating evidence that the trial counsel had unreasonably failed to unearth. Here, Carolyn Daniel testified to the wealth of mitigating evidence in Daniel's case, much of which the trial judge relied on in sentencing Daniel. Accordingly, the ACCA's denial of Daniel's claim was not an unreasonable application of *Williams*.

Moreover, the ACCA is correct that trial counsel did not admit to being unprepared for the penalty phase. Rather, the record establishes that trial counsel

requested additional time to go through information they needed to go through. Trial counsel did not request an exorbitant amount of time. Trial counsel merely requested to begin the penalty phase the next morning as opposed to the same afternoon that the guilt phase ended, indicating that trial counsel was not unprepared for the penalty phase but just needed more time to go through all his information. Additionally, the record establishes that Daniel's trial counsel did reach out to Daniel's mother in preparation for his trial. Daniel's letter to trial counsel dated February 28, 2003 states the following: "Please be advised it is I who am to stand trial, and, quite frankly, am facing a sentence of such grave seriousness of the death sentence. Not my Mother. That said, it is 'I' who you are to remain in communication with, not my mother." C.R. Vol. 12, p. 236, Ex. B (emphasis in original). This letter suggests that trial counsel was, in fact, in touch with Daniel's mother and had prepared the mitigating evidence that was presented during the penalty phase through Carolyn Daniel's testimony. Accordingly, this court finds that the ACCA's finding was also not an unreasonable determination of fact.

Even assuming his trial counsel performed deficiently by failing to prepare more for the penalty phase of trial, Daniel is still unable to "show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. After reviewing

the record as well as the arguments before this court, this court concludes that Daniel has not proven "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."*Id.* at 694. In fact, a wealth of mitigating evidence concerning Daniel's upbringing and social background were presented to the jury during the penalty phase through the testimony of Carolyn Daniel. C.R. Vol. 7, Tab 20, 895–902. Accordingly, the ACCA's ruling was not contrary to nor did it involve an unreasonable application of Supreme Court precedent.

### 2. Failure to Present Mitigating Evidence to the Jury and the Circuit Court

#### a. Procedural Default

Although Respondent raises no procedural default concerns in regard to this claim, if the State does not explicitly waive procedural default, it is not waived. Under 28 U.S.C. § 2254(b)(3), "[a] State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." *See also Dill v. Holt*, 371 F.3d 1301, 1302 n. 1 (11th Cir. 2004) (stating that 28 U.S.C. § 2254(b)(3) requires a court to address exhaustion when it is not expressly waived by the State). Daniel did not present this claim to the ACCA as he presents it here.

However, because it is cumulative of Daniel's other claims that trial counsel failed to present specific types of mitigating evidence to the jury, which Daniel did present to the ACCA, the court finds that Daniel did exhaust this claim before the state court because the reasonable reader would understand the legal and factual basis for the claim based on the postconviction petition. Accordingly, this claim is not procedurally barred from this court's review.

### b.    Merits

The court first notes that Daniel's habeas petition and reply brief present convoluted arguments for this claim, and the court understands Daniel's claim to be that his trial counsel failed to present the evidence listed in bullet points under this heading in his habeas petition. *See Dupree v. Warden*, 715 F.3d 1295, 1299 (11th Cir. 2013) ("A habeas petitioner must present a claim in clear and simple language such that the district court may not misunderstand it.") (citations omitted).

In his habeas petition, Daniel claims that a reasonable investigation by his trial counsel would have revealed the following mitigating evidence:

- On almost a daily basis, Mr. Daniel and his sisters were forced downstairs to the basement late at night to perform sexual acts on each other while [Daniel's step-father] watched. [Daniel's step-father] would then engage in sexual acts with all three of the children.

33

- Daniel and his sisters were forced to endure several [sic] physical and sexual abuse at the hands of their step-father over the course of several years . . . .;

- Each of the Daniel children lived in fear of [Daniel's step-father] as a result of the violent sexual assaults they suffered in his hands. At night, the children tried not to get up to go to the bathroom because when they did [Daniel's step-father] would grab them and molest them. During the winter months, the children huddled outsider [sic] their house in the cold because they did not want to be alone in the house with [Daniel's step-father].

Habeas Petition pp. 24–25 (doc. 1). Daniel further alleges that this information was readily available from Tammi and Carolyn Daniel, given that they provided Daniel's current counsel with this information. *Id.* at 25–26.

    In his Reply Brief, Daniel argues that the ACCA erred in several respects: (1) unreasonably applying Supreme Court precedent in finding that Daniel failed to plead how the evidence of childhood abuse would have been mitigating; (2) making an unreasonable determination of fact in concluding that Daniel failed to plead how such evidence would have been mitigating, because  "trial counsel should have enlisted the services of a mitigation expert like Martha Loring to explain the impact of childhood abuse on Daniel's development"; (3) ignoring the evidence of sexual abuse presented by Daniel; (4) making the unreasonable determination of fact that Daniel's claims concerning childhood abuse were cumulative of evidence presented at trial; (5) unreasonably applying Supreme

Court precedent in concluding that trial counsel was not ineffective for failing to present evidence of Daniel's non-violent character because, confronted with overwhelming aggravating circumstances, trial counsel could have reasonably determined that such character evidence would have been of little help; and (6) unreasonably applying *Williams* by failing to consider the prejudicial effect of trial counsel's deficient performance based on the totality of mitigating evidence. Reply Brief pp. 45–51 (doc. 23).

As to the claim concerning Daniel's childhood sexual abuse, the ACCA found that "Daniel was required to identify the names of the witnesses he alleged should have been interviewed, to plead with specificity what admissible information those witnesses would have provided, and to allege how the result of those proceedings would have been affected by the additional testimony." *Daniel*, 86 So. 3d at 430. This court finds that the ACCA's determination concerning Daniel's claims about sexual abuse was not an unreasonable determination of fact. Daniel pleaded that during an interview with current counsel, Tammi Daniel "confirmed that she had witnessed Mr. Western sexually abuse her brother and volunteered that he also forced the three Daniel children to engage in sexual acts with each other, threatening to kill Mrs. Daniel if any of them told." *Id.* Yet Daniel did not plead that Tammi Daniel would have testified to the sexual abuse Daniel

suffered. Rather, Daniel pleaded that Tammi Daniel would be available to testify about the physical abuse, but not that she was available and willing to testify about the sexual abuse. *See* Habeas Petition pp. 32–34. Daniel claims that Carolyn Daniel alluded to the sexual abuse in her testimony. Yet Daniel does not allege that Carolyn Daniel would have testified about the sexual abuse. Thus, this court disagrees with Daniel's contention that the ACCA ignored the evidence of sexual abuse presented by Daniel, because the ACCA specifically addressed the alleged sexual abuse and found any such evidence lacking. Accordingly, the ACCA's ruling is not an unreasonable determination of fact.

This court also fails to see that the ACCA unreasonably applied Supreme Court precedent in determining that Daniel failed to establish how the additional evidence would have been mitigating. The cases Daniel cites in his petition are distinguishable. For instance, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court noted that counsel's investigation was limited to one psychological examination, the written Presentence Investigation Report, and records kept by the Baltimore City Department of Social Services. *Wiggins*, 539 U.S. at 523. Moreover, the Court noted, counsel unreasonably failed to conduct an investigation into potentially mitigating evidence:

Indeed, counsel uncovered no evidence in their investigation to suggest

> that a mitigation case, in its own right, would have been
> counterproductive, or that further investigation would have been
> fruitless; *this case is therefore distinguishable from our precedents in
> which we have found limited investigations into mitigating evidence to
> be reasonable. See, e.g.*, *Strickland*, *supra*, at 699, 104 S.Ct. 2052
> (concluding that counsel could "reasonably surmise . . . that character
> and psychological evidence would be of little help"); *Burger v. Kemp*,
> 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L. Ed. 2d 638 (1997) (concluding
> counsel's limited investigation was reasonable because he interviewed
> all witnesses brought to his attention, discovering little that was helpful
> and much that was harmful); *Darden v. Wainwright*, 477 U.S. 168, 186,
> 106 S.Ct. 2464, 91 L. Ed. 2d 144 (1986) (concluding that counsel
> engaged in extensive preparation and that the decision to present a
> mitigation case would have resulted in the jury hearing evidence that
> petitioner had been convicted of violent crimes and spent much of his
> life in jail).

*Wiggins*, 539 U.S. at 525 (emphasis added). The Court further noted that although

counsel in *Wiggins* "told the jury it would 'hear that Kevin Wiggins has had a

difficult life,' counsel never followed up on that suggestion with details of

Wiggins' history. . . . Far from focusing exclusively on petitioner's direct

responsibility, then, counsel put on a halfhearted mitigation case, taking precisely

the type of '"shotgun"' approach the Maryland Court of Appeals concluded

counsel sought to avoid." *Id.* at 526 (citations omitted).

Similarly, in *Cooper v. Sec'y, Dept. of Corr.*, 646 F. 3d 1328, 1352 (11th

Cir. 2011), "the jury heard nothing about the abuse inflicted on Cooper by his

father and brother, hearing only of the abuse Cooper's father inflicted on Cooper's

mother. Dr. Merin actually testified that Cooper's father was 'exceptionally abusive, both physically and verbally,' before the judge, but there was no testimony as to the specifics of the abuse directed toward Cooper." Moreover, in *Rompilla v. Beard*, 545 U.S. 374, 392–93 (2005), the Supreme Court found that counsel's failure to investigate prior convictions resulted in failure to present mitigating evidence, and the "jury never heard any of this and neither did the mental health experts." Moreover, "[t]his evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury . . . ." *Rompilla*, 545 U.S. at 392–93.

Likewise, in *Johnson v. Sec'y, DOC*, 643 F.3d 907, 932 (11th Cir. 2011), Johnson's counsel's "investigation into Johnson's family background consisted of talking with Johnson's father, and 'that's about the extent of it.' When Johnson's father denied having been an abusive alcoholic, [trial counsel] accepted the father's denial without checking with any other family member, several of whom were ready, willing, and able to testify that Johnson was telling the truth about his abusive upbringing." *Id.* Moreover, noted the court, "[t]his is not a case in which counsel relied on what his client told him, or failed to tell him, about his background. It is, instead, a case in which counsel failed to adequately investigate what his client did tell him." *Id.* at 933 (citations omitted).

Similarly, in *Ferrell v. Hall*, 640 F. 3d 1199, 1231 (11th Cir. 2011), the court noted that "because of counsel's limited character investigation–which asked, essentially, only whether Ferrell was trustworthy and had a good reputation–counsel did not uncover readily available mitigating evidence of Ferrell's powerful mental health issues or his abused and difficult childhood, and failed to adequately utilize the witnesses who did testify on his behalf. Nor did counsel's approach reveal anything to suggest that a more comprehensive investigation would have been fruitless." *Id.* at 1231.

In *Porter v. McCollum*, 558 U.S. 30, 39 (2009), the Supreme Court noted that "counsel did not even take the first step in interviewing witnesses or requesting records." *Porter*, 558 U.S. at 39 (citations omitted). "Counsel thus failed to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service. The decision not to investigate did not reflect reasonable professional judgment." *Id.* at 40.

Daniel's trial counsel presented a variety of mitigating evidence through Carolyn Daniel's testimony. Daniel's case, then, is not one of altogether forgoing investigation or failing to present any mitigating evidence. *See White v. Singletary*, 972 F.2d 1218, 1225 (11th Cir. 1992) (finding that "[a] lawyer can almost always do something more in every case – the Constitution requires a good deal less than

39

maximum performance."). That such mitigating evidence was presented through one witness's testimony does not defeat the wealth of evidence or the jury's ability to hear it. *See Cullen v. Pinholster*, 131 S.Ct. 1388, 1406 (2011) (finding that the Ninth Circuit misapplied *Strickland* because it "drew from [the Court's] cases a constitutional duty to investigate and the principle that it is prima facie ineffective assistance for counsel to abandon their investigation of the petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.").

Daniel argues that "the CCA also made the unreasonable factual determination that the allegations concerning Daniel's childhood abuse were cumulative of the meager evidence presented at trial." Reply Brief p. 48 (doc. 23). In Daniel's case, however, the jury heard that Daniel's stepfather had on one occasion abused him so badly that he suffered a damaged kidney for which he had to go to the hospital. Moreover, the jury heard that as a result of this abuse, a court ordered Daniel to be removed from his mother and step-father's home. Additionally, Carolyn Daniel testified that the abuse was ongoing. Daniel was separated from his siblings, Daniel was moved to a boys' home where he stayed for ten months, then returned to his mother's home where he began using alcohol and marijuana at age 16. Considering the amount of mitigating evidence Daniel's

counsel presented in the penalty phase of his trial, the court cannot determine that Daniel's counsel's failure to present more extensive details concerning the mitigating evidence already presented was an unreasonable decision. Moreover, the court disagrees with Daniel's contention in his Reply Brief that the ACCA erred in finding that Daniel did not plead how the additional evidence would be mitigating because Daniel pleaded that Martha Loring could have testified about the effects of Daniel's upbringing. That an expert like Loring could have testified about the impact of the abuse Daniel suffered does not establish that such evidence in itself would have been mitigating in addition to the mitigating evidence that had already been presented. And, as to Daniel's claim that the ACCA erred in finding that counsel was not ineffective for failing to present evidence of Daniel's non-violent character, this court finds that the ACCA's determination was not unreasonable because the jury had already found Daniel guilty of capital murder.[5]

---

[5] The ACCA stated:

> Daniel does not proffer what facts could have [been] introduced that would have qualified his mother, his sister, or his aunt to testify about the specific trait of non-violence. Daniel left home when he was 18 years old and spent the four years preceding the murders in prison. Further, if evidence that Daniel did not respond to verbal conflict with physical force was presented, the prosecution could have certainly rebutted it by emphasizing the facts of this case. The jury found beyond any reasonable doubt that Daniel intentionally gunned down two unarmed people in cold blood in their own apartment just because Daniel was offended by what one of them said.

*Daniel*, 86 So. 3d at 436–37.

The court agrees with the ACCA's determination that a reasonable attorney might not have focused on Daniel's non-violent character given that the jury had already determined that Daniel was violent enough to commit capital murder. Accordingly, the court finds that the ACCA did not make an unreasonable determination of fact in finding that the evidence Daniel asserts as mitigating was cumulative of other evidence already presented.

Daniel also argues that the ACCA erred in addressing each piece of mitigating evidence, rather than the overall prejudicial effect of trial counsel's alleged deficiencies. Reply p. 51 (doc. 23). This, Daniel claims, was an unreasonable application of *Williams*. Yet the ACCA did not err in determining that Daniel's cumulative error argument failed after thoroughly analyzing each of Daniel's arguments and finding that each was unavailing. *See United States v. Murray*, 154 Fed. Appx. 740, 745 (11th Cir. 2005) ("To establish cumulative error, each alleged incident must constitute error in itself . . . .).

While Daniel has failed to establish that the ACCA made unreasonable determinations of fact or unreasonably applied Supreme Court precedent in deciding that trial counsel did not perform deficiently, Daniel also cannot establish that he was prejudiced as a result of trial counsel's alleged deficiencies. In his habeas petition, Daniel claims that trial counsel's alleged deficiencies prejudiced

him because "[a]s a result of Trial Counsel's gross ineffectiveness, the jury never heard of the chronic physical and sexual abuse Mr. Daniel suffered at the hands of Mrs. Daniel's second husband, despite obvious indications of the presence of such evidence. . . . Had available mitigating evidence been presented, there exists a reasonable probability that Mr. Daniel would have been sentenced to life without possibility of parole." Habeas Petition p. 26 (doc. 1). However, this evidence was presented as Carolyn Daniel testified that Daniel was severely abused as a child by his stepfather, that the abuse was ongoing because she was unaware of the abuse for a long time, and that it was serious enough that the Department of Human Resources removed not only Daniel but also his sisters from the home immediately. C.R. Vol. 7, Tab 20, p. 899. Moreover, the court finds Daniel's argument here to be misleading as a change in one juror's vote would have resulted in a mistrial of the sentence hearing rather than a vote for life imprisonment.[6] Alabama Code §13A-5-46(f) requires that "[t]he decision of the jury to return an advisory verdict recommending a sentence of life imprisonment without parole must be based on a vote of a majority of the jurors." In Daniel's case, then, he would have needed at least seven votes in favor of life imprisonment

---

[6] Under Alabama Code §13A-5-46(f), "[t]he decision of the jury to recommend a sentence of death must be based on a vote of at least 10 jurors. The verdict of the jury must be in writing and must specify the vote." Ala. Code §13A-5-46(f).

in order to receive such a sentence. Given that only two jurors voted against the

death penalty, Daniel would still have needed five additional jurors to vote in

favor of life imprisonment to receive such a sentence. The statute further mandates

that

> [i]f the jury is unable to reach an advisory verdict recommending a sentence, or for other manifest necessity, the trial court may declare a mistrial of the sentence hearing. Such a mistrial shall not affect the conviction. After such a mistrial or mistrials another sentence hearing shall be conducted before another jury, selected according to the laws and rules governing the selection of a jury for the trial of a capital case.

*Id.* at §13A-5-46(g).

As to prejudice, Daniel further argues that "[h]ad the wealth of available

mitigating evidence been presented on Mr. Daniel's behalf, there is a reasonable

probability that the Court would not have accepted a sentence of death. At the

sentencing phase of trial, the Court expressly noted that the 'only mitigating

evidence offered during the sentencing phase was that – the defendant's

background was that his father died in 1978 when he was three years old.' . . . Had

the Court . . . been made aware of all the other circumstances of this case that

militate strongly against Daniel's execution, including Daniel's horrific childhood

. . . there is a substantial likelihood that it would not have sentenced Daniel to

death." Habeas Petition p. 26 (doc. 1). Yet Daniel's allegation here is simply

incorrect. In discussing the non-statutory mitigating circumstances pursuant to

Ala. Code § 13A-5-52, the state trial court also relied on the following mitigating

evidence in determining Daniel's sentence:

> . . . Defendant left home when he was 18 years of age. The Defendant had attention deficit disorder and was diagnosed with dyslexia, a learning disability, during elementary school. The learning disability forced him to drop out of school in the tenth grade. The Defendant's father died in 1978 and she remarried and the stepfather physically abused the Defendant, causing the loss of a kidney. The Department of Human Resources removed the Defendant when he was 12 years old and placed him in foster care for a year. When the Defendant was 16 years old he began the use of alcohol and drugs. She addressed the jury expressing sympathy to the families of the victims and her opinion as to her son's innocence. . . .

> During the sentencing hearing before the Court, after the punishment phase before the jury, the State called Spencer Sims, the father of Loretta McCulloch, one of the victims, who asked the Court to sentence the Defendant to life without the possibility of parole as opposed to death.

> Carolyn Daniel, the mother of the Defendant, was called and she apologized to the victims' families and asked the Court to have mercy on her son. Tammy Daniel, the sister of the Defendant was called, who apologized to the victims' families and requested the Court to show mercy to her brother.

C.R. Vol. 23, Tab 58, pp. 15–16.

Daniel also argues, that "[t]here is simply no reason to think that if Trial

Counsel had simply asked the same question that current counsel asked – 'In

addition to the physical abuse, did Renard experience any other kind of abuse

growing up?' – their answers would have been different. Nor can there be any

doubt that this information should have been presented to the jury during the penalty phase at Mr. Daniel's trial." Habeas Petition pp. 26–27 (doc. 1) (citations omitted). Yet trial counsel asked Carolyn an open-ended question about Daniel's childhood abuse, to which she could have easily responded about the sexual abuse. *See* C.R. Vol. 7, Tab. R. 20, p. 898–99 ("During his childhood was there any abuse that was inflicted upon your son?"; "Would you share the abuse that you learned that Renard experienced during the time that he was a child?"). Indeed, given that Carolyn Daniel was begging for her son's life and that she did not hide any of the other horrendous abuse Daniel suffered, the court sees no reason why she would have held back from testifying about the alleged sexual abuse had she been willing to do so.

In sum, the court finds that there is no reasonable probability that had the evidence that Daniel alleged was absent from the penalty phase been adduced at trial, the result of the proceeding would have been different. The court again notes that Carolyn Daniel testified that Daniel's step-father abused him, so much so on one occasion that Daniel ended up in the hospital with a damaged kidney, and that as a result of this abuse, Daniel was removed from their home. Daniel testified in his own defense during the guilt phase of his trial, testimony that the jury obviously discredited in finding him guilty of capital murder. Additionally, at the

46

penalty phase, Daniel's claim, and his trial counsel's theory of the case, remained that he was innocent of the crime. Indeed, Carolyn Daniel testified that she did not believe that Daniel had committed the murders because of his non-violent character. Accordingly, introduction of the asserted mitigation evidence concerning why Daniel may have been more inclined to commit the crime would have run counter to the trial counsel's theory that Daniel did not, in fact, commit the crime. The court, then, disagrees that there exists a reasonable probability that the jury would not have sentenced Daniel to death had the additional evidence been presented.

Moreover, the statutory aggravating factors (that Daniel killed two people in one course of conduct, that Daniel committed the offense while under sentence of imprisonment, and that Daniel was previously convicted of a felony involving the use of threat or violence to another person) would not have been diminished by the introduction of the mitigation evidence Daniel cites in his habeas petition. *See Collier v. Turpin*, 177 F.3d 1184, 1203 (11th Cir. 1999) (noting that "in evaluating the probability that [the defendant's] jury would have rejected the death penalty, [the court] must not forget to balance the aggravating and mitigating factors that would have been before the jury in the absence of his counsel's errors") (quoting *Strickland*, 466 U.S. at 695). Accordingly, Daniel cannot establish that his trial

47

counsel's alleged failure to produce additional mitigating evidence of the abuse Daniel suffered at the hands of his step-father prejudiced him.

Thus the court finds that the ACCA neither reached an unreasonable finding of fact nor reached a conclusion that was contrary to or an unreasonable application of Supreme Court precedent in regard to Daniel's claim that trial counsel failed to present available mitigating evidence to the jury and circuit court.

### 3.   Failure to Conduct Meaningful Interviews of Daniel's Family Members and Friends

#### a.   Procedural Default

Respondent argues that "this claim is being raised as a claim under the part concerning *penalty-phase* ineffective assistance, rather than under the part concerning *guilt-phase* ineffective assistance." Response p. 14 (doc. 16) (emphasis in original). Daniel argues that although the headings of this claim are different, he presented the substance of this claim before the ACCA in that his "Rule 32 Petition alleged that trial counsel failed to present mitigating evidence concerning Daniel's tragic life history that was readily available had counsel conducted meaningful interviews of Daniel's mother or older sister." Reply Brief p. 25 (doc. 23) (citations omitted). Daniel argues that he "does not assert any new claims that were not presented in the state court proceedings, and he presents the same factual

basis for those claims." *Id.*

However, the basis of Daniel's legal claim here, that he was prejudiced by his trial counsel's failure to investigate at the penalty phase, was not presented to the ACCA. Rather, the ACCA's finding as to this claim was specifically limited to the guilt phase context: "Daniel had an extensive criminal record. If counsel had presented character evidence *at the guilt phase*, the State would have had the opportunity to rebut that evidence with proof of Daniel's bad character." *Daniel v. State*, 86 So. 3d at 419 (emphasis added). Thus, the ACCA found that Daniel asserted no clear issue of material fact as to counsel's ineffectiveness for failing to conduct interviews to produce character evidence at the *guilt phase*. *Id.* Clearly, then, the ACCA determination in this regard was limited to the introduction of this information at the guilt phase which the ACCA noted involved trial strategy concerns about whether to "open the door" to bad character evidence. Trial counsel was sure to, and did in fact, produce character evidence at the penalty phase. Accordingly, the factual and legal basis of this claim were not fairly presented to the ACCA, and the court finds that this claim is procedurally defaulted.

### b. Merits

Even were the court to conclude that this claim is not procedurally

defaulted, Daniel's arguments here are unpersuasive. Daniel argues that his

"mother made a series of attempts to contact Mr. Hughes by phone and left several

messages at his office. She eventually spoke with Mr. Hughes for just 20 minutes

in the days before her son's trial." Habeas Petition p. 29 (doc. 1). Daniel further

claims that when trial counsel failed to return Tammi Daniel's calls, she drove

from Atlanta to Birmingham to try to speak with Hughes in person, but he did not

meet her. *Id.* Daniel argues that had trial counsel met with his family he would

have learned "that when Mr. Daniel was just 3 years old, he was present when his

mother shot and killed his biological father, and that his stepfather emotionally,

physically, and sexually abused Mr. Daniel, including forcing him to engage in

sexual acts with his two older sisters when Mr. Daniel was less than ten years

old." *Id.* at 29–30.

This court finds it was not unreasonable for trial counsel not to further

investigate Daniel's background as counsel already had a wealth of mitigating

evidence to present through Carolyn Daniel's testimony. Moreover, the court notes

Daniel's statement in the letter to trial counsel dated February 28, 2003 which

reads as follows: "Please be advised it is I who am to stand trial, and, quite

frankly, am facing a sentence of such grave seriousness of the death sentence. Not

my Mother. That said, it is "I" who you are to remain in communication with, not

50

my mother." C.R. Vol. 12, p. 235, Ex. B. This letter suggests that trial counsel was, in fact, in touch with Daniel's mother.

Additionally, even were the court to conclude that trial counsel performed deficiently, Daniel can establish no prejudice resulting from the alleged deficiencies. Daniel merely claims that he was "present when his mother shot and killed his biological father." Daniel does not argue that he observed the shooting or even that he heard the shooting. That Daniel was present when the shooting occurred could signal that Daniel was present in the home completely isolated from the incident. Carolyn Daniel testified to the severe abuse that Daniel suffered at the hands of his step-father, abuse so atrocious that Daniel at one time suffered kidney damage and was subsequently removed from Carolyn Daniel's home. Certainly, the jury did not hear about the ongoing sexual abuse that Daniel also allegedly suffered. Yet the jury was well aware that Daniel suffered bouts of severe abuse. Additionally, Daniel did not plead that Tammi Daniel or Carolyn Daniel would have testified about the sexual abuse. Most importantly, perhaps, trial counsel asked Carolyn Daniel general questions about the abuse that Daniel suffered as a child, to which she responded about the physical abuse Daniel suffered at the hands of his step-father. *See* C.R. Vol. 12, Tab 20, pp. 898–99. The court sees no reason for Carolyn Daniel to omit testimony concerning the sexual

abuse when she readily admitted the severe physical abuse, admitted that Daniel was removed from her home, and was begging for the jury to spare his life. Accordingly, Daniel cannot establish that had his trial counsel further investigated the putative testimony of Carolyn and Tammi Daniel, there is a reasonable probability that the jury would not have sentenced him to death.

### 4.  Failure to Introduce Evidence Concerning the Death of Daniel's Father

As to Daniel's claim that trial counsel failed to introduce evidence concerning the death of Daniel's father, the ACCA found that "Daniel failed to plead how he was prejudiced by counsel's failure to present evidence concerning the facts surrounding his biological father's murder. He failed to comply with the pleading requirements of Rule 32.6(b), Ala. R. Crim. P." *Daniel*, 86 So. 3d at 429(citation omitted).This claims is subject to AEDPA review by this court as it involves a *Strickland* prejudice determination and "[a] ruling by an Alabama court under Rule 32.6(b) is . . . a ruling on the merits." *Borden*, 646 F.3d at 812.

Because the state court did not address the deficiency prong, this court may address this prong *de novo*. *See Porter*, 558 U.S. at 39 ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo*.") (citation omitted). During the penalty phase,

trial counsel did present evidence that Daniel was three years old when his father died:

[Defense Counsel]: . . . . When did his father die?

[Ms. Daniel]: In 1978.

[Defense Counsel]: Were you all married at the time?

[Ms. Daniel]: Yes.

[Defense Counsel]: Was he a member of the household?

[Ms. Daniel]: No. We had separated.

[Defense Counsel]: How old was Renard at the time?

[Ms. Daniel]: Three.

[Defense Counsel]: He was three years old?

[Ms. Daniel]: Mm-hmm.

C.R. Vol. 7, Tab R. 20, p. 898. Daniel does not claim that he saw his father killed or that he heard any of the violence. Rather, Daniel claims that he was "present" when his father was killed. The court cannot conclude that such evidence that he was "present" when he was father was killed would have made any difference in the jury's determination. Accordingly, the court concludes that it was not unreasonable for trial counsel not to introduce evidence that Daniel was "present" when his father was killed.

Moreover, this court concludes that the ACCA's determination that Daniel failed to establish that he was prejudiced by trial counsel's failure to introduce evidence concerning the death of his father was not an unreasonable application of Supreme Court precedent. This court first notes that Daniel was twenty-eight at the time of the murders and evidence concerning the death of his father when he was three years old would have likely carried little weight with the jury. *See Mills v. Singletary*, 63 F.3d 999, 1025 (11th Cir. 1995) ("We note that evidence of Mills' childhood environment likely would have carried little weight in light of the fact that Mills was twenty-six when he committed the crime.") (quoting *Bolender v. Singletary*, 16 F.3d 1547, 1561 (11th Cir. 1994) (finding that evidence of an abusive childhood is entitled to little weight given the fact that petitioner was twenty-seven years old at the time of the murders)). Daniel claims that his trial counsel deficiently failed to present evidence to the jury that "his father was killed by his mother as Mr. Daniel, then three years old, stood nearby . . . ." Habeas Petition pp. 30–31 (doc. 1). Daniel further claims that one night he and "his two older sisters were awakened by the sound of their parents fighting." *Id.* at 31. Daniel specifically characterizes the situation as follows: "He was then present when his mother shot and killed his biological father." *Id.* Strangely, as the court noted above, Daniel does not claim that he saw his mother shoot his father or that

54

he heard any gun shots. Rather, Daniel alleges that he was awakened by the sound of his parents fighting and was "present" when his mother killed his father. It seems that Daniel would have the court assume that he actually observed the shooting. Moreover, Daniel fails to describe in any way how the jury's ability to hear that he was "present" at the time his mother killed his father when he was three years old would have resulted in a reasonable probability that Daniel would not have been sentenced to death. Daniel, it seems, would also have the court assume how he was prejudiced by his trial counsel's alleged deficiency in this regard. Accordingly, the ACCA's finding that Daniel failed to plead how evidence of his father's death prejudiced him was neither contrary to nor an unreasonable application of Supreme Court precedent.

### 5.   Failure to Introduce Evidence of Chronic Physical, Emotional, and Sexual Abuse

In his habeas petition, Daniel claims that Daniel's step-father "frequently walked around the house carrying a gun and wearing a sash of bullets" and that he "regularly beat Mrs. Daniel in front of her children and threatened her with various forms of torture–including burning her hands in the fireplace." Habeas Petition p. 32 (doc. 1) (citation omitted). Daniel further claims that his step-father beat him at least twice a week, that he suffered more severe beatings than the other children,

and that he or his sister, Tammi, would have readily testified about this. *Id.* at 32–33.

Moreover, as to the sexual abuse, Daniel claims that trial counsel should have discovered and presented evidence that he and his sisters were forced to perform sexual acts on each other and with their step-father and that they huddled together outside the house to avoid being alone with their step-father. *Id.* at 33. Daniel claims that his mother alluded to the sexual abuse in her penalty phase testimony, which trial counsel should have further investigated. *Id.* Daniel further claims that "[i]n addition to being abused by his stepfather, Mr. Daniel suffered physical assaults at the hands of his older sister, Tiauna, who stabbed him with a 12-inch knife, was responsible for breaking his arm, and forced him to join a gang when he was only 12 years old." *Id.* at 34–35 (citation omitted).

As to Daniel's claim about physical abuse at the hands of his stepfather, the ACCA concluded that "counsel presented the testimony of Daniel's mother at the penalty phase. His mother testified that Daniel was physically abused by his stepfather and that one beating was so severe a kidney was damaged and had to be removed. Also, the circuit court found as nonstatutory mitigating evidence that Daniel had suffered severe abuse at the hands of his stepfather, that as a result of the abuse his stepfather ruptured one of his kidneys, and that Daniel had had

surgery to remove the damaged kidney." *Daniel,* 86 So. 3d at 429. The ACCA

further noted that "[t]he failure to present additional mitigating evidence that is

merely cumulative of that already presented does not rise to the level of a

constitutional violation." *Id.* at 429–30.

As to Daniel's claim about counsel's failure to present evidence of sexual

abuse by his stepfather, the court concluded that "[t]o plead the claims sufficiently,

Daniel was required to identify the names of the witnesses he alleged should have

been interviewed, to plead with specificity what admissible information those

witnesses would have provided, and to allege how the result of the proceedings

would have been affected by the additional testimony." *Id.* at 430 (quotation marks

and citations omitted). Accordingly, the court determined, Daniel failed to comply

with the pleading requirements of Rule 32.6(b). *Id.* Because the ACCA determined

that Daniel's allegations were cumulative of evidence already presented and that

Daniel failed to comply with 32.6(b)'s requirements, these rulings were on the

merits and are subject to AEDPA review by this court. *See Borden*, 646 F.3d at

812 ("A ruling by an Alabama court under Rule 32.6(b) is . . . a ruling on the

merits.").

Because Carolyn Daniel did testify to the severe physical abuse, the ACCA

finding is not an unreasonable determination of fact and Daniel cannot establish

that his attorney performed deficiently in this regard. As to the sexual abuse,

Daniel alleged that Tammi Daniel would be available to testify about the physical

abuse, but not that she was available and willing to testify about the sexual abuse.

*See* Habeas Petition pp. 32–34. Daniel claims that Carolyn Daniel alluded to the

sexual abuse in her testimony, but does not allege that she, or any other witness,

would have testified about the alleged sexual abuse. The ACCA stated:

> During the initial meeting between Mr. Daniel's family and his current
> counsel, Mrs. Daniel volunteered information concerning Mr. Western's
> [Daniel's stepfather's] sexual abuse of her children. Mrs. Daniel
> explained that, long after Mr. Western had ceased terrorizing the Daniel
> family she received a call from her oldest daughter, Tiauna, who was
> then an adult living in Atlanta. During their conversation, Tiauna told
> her mother that Mr. Western molested her and threatened that if she or
> her siblings ever told, Social Services would take them away. After Mrs.
> Daniel relayed this event, Mr. Daniel's sister Tammi confirmed that she
> had witnessed Mr. Western sexually abuse her brother and volunteered
> that he also forced the three Daniel children to engage in sexual acts
> with each other, threatening to kill Mrs. Daniel if any of them told.

*Daniel*, 86 So. 3d at 430. Thus, there is no allegation that Tiauna[7] told Mrs. Daniel

of Mr. Western's abuse of her, or that Tammi confirmed that she had witnessed Mr.

Western sexually abusing all the Daniel children, *before* Daniel's trial.

Daniel argues that Mrs. Daniel alluded to the sexual abuse of Daniel by his

step-father during her trial testimony in that when asked to describe the abuse Mr.

---

[7] The court notes that Tiauana is the same sister who allegedly stabbed Daniel and forced
him to join a gang at age 12.

Western inflicted on Daniel, Mrs. Daniel stated: "[h]e abused Renard and I did not know about it for a long time." Habeas Petition pp. 33–34 (doc. 1). However, Daniel surmises that the unsolicited testimony of Mrs. Daniel would have been about the sexual abuse. Yet the ACCA found that only when meeting with "current counsel", i.e. Daniel's Rule 32 counsel, did Mrs. Daniel volunteer information about the sexual abuse. Mrs. Daniel's trial testimony does not indicate that she was even aware of the sexual abuse at the time of the penalty hearing. The abuse that she testified that she did not know about for a long time could well have been the severe physical abuse that Mr. Daniel suffered.

Moreover, trial counsel asked Carolyn Daniel open-ended questions about the abuse Daniel suffered as a child, and Mrs. Daniel specifically responded about the severe physical abuse. The court sees no reason for Mrs. Daniel to hide evidence of sexual abuse given that she was begging for her son's life and readily admitted to other severe abuse. Accordingly, the ACCA's ruling is not an unreasonable determination of fact in this regard. And, as to the claims about Tiauna Daniel's physical assault, this court finds that a reasonable attorney in trial counsel's position may not have wanted to "open the door" to evidence about Daniel's past gang involvement. There is a reasonable probability that such evidence would not have been mitigating for the jury.

Because Daniel's attorney did present evidence of his physical abuse, because Daniel failed to allege that any witness would be willing and available to testify concerning the sexual abuse, and because a reasonable attorney may well have declined to present evidence about Tiauana's abuse that could have "opened the door" to Daniel's past gang involvement, the court finds that trial counsel did not act unreasonably in this aspect of their representation. Accordingly, the ACCA's findings also were not contrary to or an unreasonable application of Supreme Court precedent.

Daniel also cannot establish that he was prejudiced by trial counsel's failure to present additional evidence of his abuse by his step-father. Through Carolyn Daniel's testimony, the jury could easily grasp that Daniel suffered ongoing abuse at the hands of his stepfather. Carolyn Daniel testified that the abuse went on for a long time (C.R. Vol. 7, Tab R. 20, p. 899) and that on one occasion it was so bad that Daniel suffered a ruptured kidney requiring surgery. Daniel seems to argue that testimony that he was abused for a long time and that he was beaten so severely at one point that he suffered a damaged kidney is insufficient to establish the mitigating evidence that Daniel suffered severe ongoing abuse from his step-father. Looking at Carolyn Daniel's testimony, however, this court agrees with the ACCA's finding that evidence that Daniel suffered physical abuse from his step-

60

father at least twice a week and was beaten more than the other children was

cumulative of the evidence already presented. Additionally, because Daniel did

not plead that any of his relatives were ready and willing to testify about the

alleged sexual abuse, he fails to establish that he was prejudiced by trial counsel's

alleged failure to present any such evidence. In other words, Daniel, then, cannot

establish that had this additional evidence about his childhood abuse been offered,

there is a reasonable probability that the jury would not have sentenced him to

death. Thus, this court finds that the ACCA's finding was not contrary to or an

unreasonable application of Supreme Court precedent.

### 6.    Failure to Explore Daniel's Possible Mental Retardation

Daniel claims that school records from the Birmingham Department of

Education showed that "Daniel, then in sixth grade, had 'severely deficient'

reading comprehension on the level of a student beginning of [sic] second grade,

and that his math skills were also at a second grade level and also 'severely

deficient.'" Habeas Petition p. 36 (doc. 1) (citations and footnote omitted).

Moreover, Daniel claims that "[o]ther records indicate that Daniel was 'distractible

[sic], disruptive, over-active, and exhibit[ed] bizarre behavior (laughs for no

reason)' as a child." *Id.* at 37 (citation omitted). Daniel claims that had trial

counsel consulted certain records, they would have learned that Daniel was

"within the '[b]orderline classification of intelligence' according to both the Wechsler Intelligence Scale for Children–Revised (the "WISC-R") and the Slosson Intelligence Test." *Id.* (citations omitted). Daniel further argues that experts Daniel Marson and Kristen Triebel, "affiliated with the University of Alabama at Birmingham," concluded that Daniel's "adaptive functioning was severely impaired both prior to and after age 18." Habeas Petition pp. 39–40 (doc. 1). Daniel claims that Marson and Triebel's report shows that he "had difficulty understanding and following the testing instructions, and that, in particular, he had 'significant difficulty reading aloud' and was 'easily distracted.'" *Id.* at 40.

Daniel also argues that the ACCA looked at his mental retardation claim under *Atkins*. In doing so, Daniel claims, the court considered whether it would have been unconstitutional to sentence Daniel to death as a mentally retarded individual.[8] Daniel argues that the court should have considered his attorney's failure to introduce borderline retardation as mitigating evidence. This, Daniel claims, was an unreasonable application of *Porter*, *Wiggins*, and *Williams*. Reply

---

[8] The court recognizes that the term "intellectual disability" is increasingly replacing "mental retardation." However, because Daniel used the term "mental retardation" in his habeas petition, the court shall use that term as well. *See Burgess v. Comm'r, Ala. Dep't Corr.*, 723 F.3d 1308 n. 1 (11th Cir. 2013) ("increasingly professionals in this field, such as the American Association on Intellectual and Development Disabilities (formerly the American Association on Mental Retardation), are replacing the term 'mental retardation' with 'intellectual disability' or 'intellectual developmental disability'").

Brief pp. 55–56.

As to the claim that Daniel's trial counsel was ineffective for failing to

explore Daniel's possible mental retardation, the ACCA found that

> [t]he record of Daniel's trial shows that Daniel testified in his own defense, that he appeared articulate and easily answered the questions put to him, and that he showed no sign of mental retardation. He said that he had been living in an apartment in the complex where the murders took place, that he worked at Hill Top Properties as a roofer, and that he lived one block from Hill Top Properties. Daniel testified that he met George Jackson several weeks before the murders when Jackson was working on his car in the apartment complex parking lot. He said that he and Jackson became friends and that they frequently drank beer together. Daniel testified that Jackson committed the murders.
>
> Also, at a pretrial-motion hearing trial counsel indicated that he was requesting a mental evaluation because of information obtained by Daniel's mother that he had been diagnosed with ADHD and dyslexia but based on his conversations with Daniel he did not believe that a full-blown evaluation was necessary. (Trial R. 15–20). Counsel also stated at this hearing that he asked both Daniel and his mother if Daniel had been treated for any mental illness and both indicated that he had not.

*Daniel*, 86 So. 3d at 432. The ACCA continued as follows:

> The United States Supreme Court in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), held that it was a violation of the Eighth Amendment to execute a mentally retarded individual but that it was up to the individual states to define mental retardation. Alabama has yet to enact legislation addressing this issue; however, the Alabama Supreme Court in *Ex parte Perkins*, 851 So.2d 453 (Ala.2002), adopted the most liberal definition of mental retardation. According to *Perkins*, the defendant must possess: (1) significant subaverage intellectual functioning; i.e., an IQ of 70 or below; (2) significant or substantial

> deficits in adaptive behavior; and (3) these defects must have manifested themselves during the developmental years; i.e., before the defendant reached the age of 18. Daniel asserts that according to the Flynn effect,[9] his IQ is 72 and he argues that he is retarded and counsel was ineffective for failing to present evidence of mental retardation.

*Id.* at 432–33. Noting that Alabama has yet to address the Flynn effect, the court determined that "[e]ven considering the Flynn effect, Daniel did not plead in his postconviction petition that his IQ was 70 or below." *Id.* at 433. Accordingly, Daniel failed to plead facts sufficient to support his claim. Moreover, the court noted, "counsel stated before Daniel's trial that based on his conversations with Daniel he did not believe that a full mental evaluation was necessary and that Daniel and his mother told him that Daniel had never been treated for any mental illness. To the extent that Daniel argues that counsel was ineffective for failing to explore the possibility that he is mentally retarded, there is no material issue of fact or law that would entitle Daniel to relief on this claim. *See* Rule 32.7(d), Ala. R. Crim. P." *Id.* at 433–34. Because the ACCA found that Daniel failed to state a claim and failed to establish a material issue of fact or law, this ruling was on the merits and may be reviewed by this court. *See Borden*, 646 F.3d at 822 n. 44 (". . .

─────────────

[9] Daniel describes the Flynn effect as the "phenomenon of rising IQ scores . . . , named after Dr. James Flynn, a political scientist who has extensively studied and documented it." Habeas Petition p. 38 (doc. 1) (citation omitted). More specifically, Daniel notes, "[e]ver since the introduction of standardized IQ tests in the early 20th century, there has been a systematic pervasive rise in IQ scores all over the world, including the United States." *Id.* (citation omitted).

[R]ather than find it insufficiently pled, the ACCA summarily dismissed it under Rule 32.7(d) because it failed to present a material issue of law or fact. This dismissal was on the merits, and therefore subject to AEDPA review by this court.").

Trial counsel specifically asked Mrs. Daniel about any learning disabilities Daniel experienced in the first eighteen years of his life that he lived with his mother:

> [Defense Counsel]: While in elementary school, did you or the defendant have any problems?
>
> [Mrs. Daniel]: We had some, yes, we did.
>
> [Defense Counsel]: Would you share those problems with the ladies and gentlemen of the jury, please, ma'am?
>
> [Mrs. Daniel]: Yes. Renard had problems in school basically based on his ADHD, which is – I'm sorry. I'm so nervous I can't think. Attention Deficit-Hyperactivity Disorder, and he was also diagnosed with dyslexia, which is a learning disability.
>
> [Defense counsel]: That's what I was just getting ready to ask you. For the ones that may not know the terms you just mentioned, would you kind of give them your understanding of what those learning disorders were?
>
> [Mrs. Daniel]: Yes. The way it was explained to me when he was diagnosed with this illness, he could not see letters the way we see them. They would always appear backwards or in some other form in his mind. His brain could not process, you know, the alphabet the way our brain possesses it [sic].

T.R. Vol. 7, Tab 20, pp. 896–97.

> [Defense Counsel]: Did the problems you just mentioned early on, did they continue until he was up in high school?

> [Ms. Daniel]: Yes.

*Id.* at 897.

The court also notes that the same school records Daniel cites have notations that would not necessarily have been mitigating. For instance, the records also state that "Renard was cooperative during the testing session. He was also attentive to tasks as they were presented to him." T.R. Vol. 12, Ex. J. The records further state that "[w]ithin the Performance area, average ability was evidenced in visual concentration, visual organization involving sequential thinking and non-verbal reasoning and perceptual-motor integration." *Id.* Although the Board found that Daniel's verbal skills were developing at a much slower rate than average, the Board also noted that Daniel's "[p]erformance abilities are higher than Verbal and closer to average in rate of development." *Id.* Moreover, the report noted that "Renard, does not, at this time, meet State guidelines for special education." *Id.* Accordingly, while the report included information concerning Daniel's learning disabilities, it also included statements indicating that Daniel had average performance abilities in some areas and did not

66

qualify for special education by state guidelines, evidence a reasonable attorney may not have wanted introduced to the jury for the purpose of establishing the mitigating factor of Daniel's borderline mental retardation. Additionally, the ACCA did not merely determine that Daniel was not mentally retarded under *Atkins*. Rather, the ACCA's determination that trial counsel did not perform deficiently by failing to further explore Daniel's mental retardation was based on the fact that "[t]he record of Daniel's trial shows that Daniel testified in his own defense, that he appeared articulate and easily answered the questions put to him, and that he showed no sign of mental retardation. He said that he had been living in an apartment in the complex where the murders took place, that he worked at Hill Top Properties as a roofer, and that he lived one block from Hill Top Properties." *Daniel*, 86 So. 3d at 432. The ACCA also considered that "at a pretrial-motion hearing trial counsel indicated that he was requesting a mental evaluation because of information obtained by Daniel's mother that he had been diagnosed with ADHD and dyslexia but based on his conversations with Daniel he did not believe that a full-blown evaluation was necessary. (Trial R. 15–20). Counsel also stated at this hearing that he asked both Daniel and his mother if Daniel had been treated for any mental illness and both indicated that he had not." *Id.*

Further, under *Fugate v. Head*, 261 F.3d 1206, 1221–22 (11th Cir. 2001), to show ineffective assistance of counsel for failure to present expert testimony at the sentencing phase, a petitioner must establish the following:

> (a) that it was professionally unreasonable for counsel not to investigate; (b) what kind of, and how much, investigation an ordinary, reasonable lawyer would have undertaken; (c) that it is reasonably probable that a reasonable investigation would have turned up an expert who would have presented testimony similar to that which was eventually adduced; and (d) that it is reasonably probable that this testimony would have affected the sentence eventually imposed. Failure to meet *any* of these steps defeats the ineffectiveness claim.

*Fugate*, 261 F.3d at 1221–22 (citations omitted). Daniel does not allege that a reasonable lawyer's investigation would have turned up an expert who would have had similar testimony to Drs. Marson and Triebel. Daniel provides no evidence that Marson and Triebel's methods or conclusions are widely available or acceptable or that a reasonable investigation by trial counsel would have turned up similar testimony by another expert witness. In fact, it is reasonably probable that an expert would have given testimony different than Drs. Marson and Triebel given that their conclusions about Daniel's adaptive functioning ability are contradicted by the trial record. Considering the foregoing, this court finds that the ACCA's determination was not contrary to or an unreasonable application of Supreme Court precedent.

68

Even were this court to conclude that the ACCA unreasonably found that Daniel's trial counsel had not performed deficiently by failing to explore the possibility of Daniel's borderline mental retardation, Daniel cannot establish that he was prejudiced by this alleged deficiency. As the ACCA noted, Daniel articulately testified in his own defense, had a job, and had been living on his own. Moreover, trial counsel asked Daniel and his mother if Daniel had been treated for any mental illness and both replied that Daniel had not. Again, this court sees no reason for Mrs. Daniel to have omitted any information about Daniel's borderline mental retardation given that she testified about the other aspects of Daniel's troubled upbringing and was begging for her son's life to be spared. Additionally, the jury witnessed Daniel testify and learned that he was living on his own and maintained a job.

As for Daniel's Flynn-adjusted IQ score, as Daniel himself notes, "[t]he American Association of Mental Retardation ('AAMR') provides that individuals with 'an IQ standard score of approximately 70 to 75 or below' *may* suffer from mental retardation." Habeas Petition p. 37 (emphasis added) (citations omitted). Accordingly, that Daniel had a childhood IQ score of 72 does not necessarily indicate mental retardation. *See also id.* at 38 (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 40 (4th Ed.

69

1994)) ("it is possible to diagnose mental retardation in individuals with IQs between 70 and 75 *who exhibit significant deficits in adaptive behavior*") (emphasis added).

Moreover, the testimony by Drs. Marson and Triebel directly contradicts the record showing that Daniel was self-sufficient, employed, and living by himself. As Daniel notes, "adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *Id.* at 40 n. 12. The jury observed that Daniel had a job, had his own apartment, had a car that he was having repaired, and was capable of sitting on the stand and articulately relaying his account of the night of the murders. The record then directly contradicts Drs. Marson and Triebel's conclusion that Daniel's adaptive functioning was severely impaired after the age of 18. In reading the trial transcript, this court finds that Daniel had no difficulty answering questions on the stand or remaining focused on the questions put before him, evidence that the jury clearly had access to after having witnessed him testify. When asked about Daniel's job performance, K.V. Hill described Daniel as good and reliable:

[Trial Counsel]: Mr. Hill, how long had you known Renard Daniel?

70

[Hill]: I would say approximately two-and-a-half, three months.

. . . .

[Trial Counsel]: How long had he worked for you?

[Hill]: Off and on during that time.

[Trial Counsel]: And how do you describe him as a worker? Was he dependable?

[Hill]: Good.

[Trial Counsel]: When you assigned him a task, did he complete it?

[Hill]: Yes.

[Trial Counsel]: You could rely on him if you gave him a job to perform?

[Hill]: Yes.

C.R. Vol. 4, pp. 312–13.

Accordingly, Daniel cannot establish that had evidence of his "borderline mental retardation" been presented in addition to the mitigating evidence that had already been presented to the jury, there is a reasonable probability that the jury would have reached a different outcome in the penalty phase of his trial. Thus, this court concludes that the ACCA's determination was not contrary to or an unreasonable application of federal law.

### 7.    Failure to Procure Necessary Expert Assistance

### a.    Procedural Default

Daniel argues that "Trial Counsel was ineffective for failing to procure the assistance of a mental health expert and/or social worker, which was readily accessible and necessary to effectively challenge the State's case." Habeas Petition p. 42 (doc. 1). Respondent argues that this is a new claim in that "this claim is being raised as a claim under the part concerning *penalty-phase* ineffective assistance, rather than under the part concerning *guilt-phase* ineffective assistance." Response p. 21 (doc. 16) (emphasis in original). Daniel, however, claims that he does "not assert any new claims that were not presented in the state court proceedings, and he presents the same factual basis for those claims." Reply Brief p. 25 (doc. 23). However, the basis of Daniel's legal claim here–his trial counsel's failure to procure expert assistance at the penalty phase, not the guilt phase–was not presented to the ACCA. Rather, the ACCA determined that Daniel failed to make out a claim that his trial counsel performed deficiently at the guilt phase by failing to procure expert assistance because "Daniel failed to plead on what legal basis a sociologist's testimony would have been admissible *at the guilt phase* of Daniel's trial to explain Daniel's state of mind as to why he failed to inform the police about Jackson's involvement in the murders. In fact in *Gaddy v.*

72

*State*, 952 So. 2d 1149, 1163 (Ala. Crim. App. 2006), [the court] affirmed a circuit court's ruling that similar testimony would have been admissible only to support a claim of not guilty by mental disease or defect." *Daniel*, 86 So. 3d at 424 (emphasis added).

Clearly, then, the ACCA's determination in this regard was limited to the inadmissibility of this type of evidence at the guilt phase. However, the ACCA also found that "at trial Daniel testified that the reason he did not tell the police that Jackson was involved in the homicides was that he promised Jackson he would not tell. *Counsel is not ineffective for failing to secure the services of an expert whose testimony would have been inconsistent with the defendant's own version of events.*" *Id.* (citation and quotation marks omitted) (emphasis added). This holding would apply to Daniel's claim that counsel was ineffective for failing to procure a mental health expert's assistance at the penalty phase as well, because a mental health expert's testimony at the penalty phase concerning the sociological reasons Daniel did not implicate Jackson would still have been inconsistent with Daniel's own testimony at the guilt phase. Accordingly, the factual and legal basis of this claim were fairly presented to the ACCA, and the court finds that this claim is not procedurally defaulted.

**b.    Merits**

Daniel argues that Trial Counsel unreasonably failed to investigate the reasons Daniel should have had a mental health evaluation. Moreover, Daniel claims that "to the Circuit Court's question as to whether Mr. Daniel had ever been diagnosed with any kind of mental illness, Trial Counsel simply responded that he had not." Habeas Petition p. 43 (doc. 1). Daniel further argues that trial counsel should have raised the information about Daniel's learning disabilities in his school records as well as Daniel's troubled upbringing as grounds for his mental health evaluation. *Id.*

However, trial counsel asked Carolyn Daniel about any problems Daniel had in elementary school, to which she responded that he suffered from ADHD and Dyslexia. C.R. Vol. 7, Tab R. 20, pp. 896–97. Carolyn Daniel had no incentive to hold back information about Daniel's mental health issues given that she was pleading for her son's life. Accordingly, the court finds that trial counsel did not perform deficiently by failing to further investigate Daniel's mental health.

Moreover, Daniel's attorney did not perform unreasonably by declining to introduce Daniel's school records. The same school records have notations that would not necessarily have been mitigating. For instance, the records also state that "Renard was cooperative during the testing session. He was also attentive to tasks as they were presented to him." C.R. Vol. 12, Ex. J. The records also state

74

that "[w]ithin the Performance area, average ability was evidenced in visual concentration, visual organization involving sequential thinking and non-verbal reasoning and perceptual-motor integration." *Id.* Although the Board found that Daniel's verbal skills were developing at a much slower rate than average, the Board also noted that Daniel's "[p]erformance abilities are higher than Verbal and closer to average in rate of development." *Id.* Moreover, the report noted that "Renard, does not, at this time, meet State guidelines for special education." *Id.* Accordingly, while the report included information concerning Daniel's learning disabilities, it also included statements indicating that Daniel had average performance abilities in some areas and did not qualify for special education by state guidelines. Additionally, the letter Daniel sent to trial counsel dated 02/28/2003 certainly did not evidence any mental retardation on Daniel's part and could not have put trial counsel on notice of any alleged retardation. *See* C.R. Vol. 12, p. 236, Ex. B.

Daniel argues that a mental health expert "could have provided critical testimony to explain that Mr. Daniel's failure to implicate Mr. Jackson in the shootings when initially questioned by the police was not only understandable, but expected given the conditioning that had taken place in his formative years." Habeas Petition p. 45 (doc. 1). An expert like Dr. Loring, Daniel claims, "would

have helped the jury realize that Mr. Daniel's failure to implicate Mr. Jackson in the shootings when questioned by the police is consistent with the conditioning in his early childhood." *Id.* at 48. Daniel argues that had the jury heard all of Loring's analysis, they would have understood why Daniel changed his statement of the events, but that the jury was "left with the impression that [Daniel] changed his mind only upon hearing that he had been blamed by another." *Id.* However, Daniel had already testified that he did not tell the police about the murders because he promised Jackson he would not tell. C.R. Vol. 6, p. 706. Thus, it was not unreasonable for trial counsel to decline the procure the assistance of an expert whose testimony would have been contradictory to Daniel's own trial testimony. Accordingly, the ACCA's finding that Daniel's trial counsel was not ineffective for failing to procure the assistance of a mental health expert was not an unreasonable determination of fact or contrary to or an unreasonable application of Supreme Court precedent.

In any event, Daniel cannot establish that he was prejudiced by trial counsel's alleged failure to procure the assistance of a mental health or social work expert at the penalty phase of trial. The court first notes that Daniel fails to establish how Dr. Loring could have served as a mental health expert. Here, Daniel seems to equate social background with mental illness, and the court is

unable to ascertain what, if any, mental illness Daniel is alleging. Nevertheless, Daniel argues that Dr. Loring could have testified that Daniel "was conditioned to remain silent when he viewed others commit criminal acts because he was repeatedly told that members of his family, in particular his mother, would be tortured or killed"; that Daniel was subjected to severe physical and sexual abuse for several years and was told that if he ever revealed the abuse, his stepfather would kill his mother; that Daniel's sister forced him to join a gang when he was twelve years old at which point he saw gang members' lives threatened for reporting illegal activity; that at some point Daniel refused to implicate his girlfriend in his stabbing because of his alleged ingrained mentality; that Daniel exhibited loyalty to inappropriate people; and that Daniel's failure to report to the police stems from the abuse he suffered as a child in which the police failed to intervene. Habeas Petition pp. 46–48 (doc. 1).

First, the court fails to see how Daniel was prejudiced by trial counsel's failure to present evidence of Daniel's gang involvement.  Moreover, the jury heard Daniel testify that he did not commit the murders and that it was Jackson who killed the victims. Yet the jury discredited Daniel's testimony and found him guilty of capital murder. The court fails to see how Daniel was prejudiced by trial counsel's failure to present evidence of a mental health expert at the penalty phase

to explain why Daniel did not implicate Jackson in the murders immediately after the commission of the crime when the jury had already determined that Daniel did in fact commit the crime. Moreover, information about Daniel's mental health status would not necessarily have been mitigating. *See Rutherford v. Crosby*, 385 F.3d 1300, 1316 (11th Cir. 2004) ("Although expert testimony about his mental health probably would have lent weight to the suffering aspect of the portrayal, it also would have placed damaging information before the jury.").

Daniel argues that had the jury heard all of Loring's analysis, they would have understood why Daniel changed his statement of the events, but that the jury was "left with the impression that [Daniel] changed his mind only upon hearing that he had been blamed by another." Habeas Petition p. 48 (doc. 8). Yet on direct examination Daniel did testify that he only changed his position after learning that Jackson had implicated him in the murders:

> [Prosecutor]: I mean, George was that close of a friend that you would lie for him and take it to the grave?
>
> [Daniel]: That I would lie to him and take it to the grave?
>
> [Prosecutor]: You would lie for him.
>
> [Daniel]: No, I didn't say I would lie for him. I said I wouldn't tell on him.
>
> [Prosecutor]: Wouldn't tell on him –

[Daniel]: Yes, sir.

[Prosecutor]: – even if it meant you going to prison?

[Daniel]: No.

[Prosecutor]: No what?

[Daniel]: No, sir. Because at that point I didn't know George had said I did it.

C.R Vol. 6 pp. 753–54. Accordingly, Daniel's claim here is meritless and he cannot establish that had evidence concerning his mental health status been admitted during the penalty phase, there is a reasonable probability that the jury would not have sentenced him to death.

### 8.    Failure to Introduce Available Evidence that Mr. Daniel Suffers from Depression

Daniel argues that trial counsel was ineffective for failing to uncover and present evidence of Daniel's depression. Habeas Petition pp. 48–49. Further, Daniel claims, Drs. Marson and Triebel "concluded that Mr. Daniel is currently severely depressed and that it is likely that Mr. Daniel had suffered from depression since childhood." *Id.* at 49 (citation and question marks omitted).

As to Daniel's argument that counsel was ineffective for failing to present evidence that Daniel was depressed, the ACCA held that "Daniel did not plead

that his depression was a factor in the murders, that it was relevant to mitigate the murders, or that he was prejudiced by counsel's failure to present this evidence at the penalty phase." *Id.* at 434. Because the ACCA's holding involved a *Strickland* prejudice determination, this holding was on the merits and subject to AEDPA review by this court.

In reviewing the trial record, this court finds that Daniel's trial counsel did in fact present evidence of Daniel's possible depression at the penalty phase of trial. In fact, trial counsel asked Mrs. Daniel about Daniel's constitution after he returned home, and she answered as follows:

> [Defense Counsel]: Okay. After you got him back, did you notice any changes in Renard – after you got him back?
>
> [Ms. Daniel]: Yes, sir. He was withdrawn a lot of the times. And he would always seem like he was hurting on the inside, but I could never get him to tell me what he was feeling or what he was thinking.

C.R. Vol. 7, Tab. R. 20, p. 902. That such evidence was not presented in the way and to the degree that Daniel's current counsel prefers does not defeat the fact that Daniel's trial counsel did in fact present such evidence during the penalty hearing. Moreover, even assuming that Marson and Triebel's assessment is correct and that it is not surprising that Daniel would have exhibited the hallmarks of depression as a child, this analysis does not indicate that Daniel was depressed at the time of the

murders. Accordingly, this court finds that the ACCA's finding is not an unreasonable determination of fact. Moreover, trial counsel did not perform unreasonably because Carolyn Daniel testified to the jury about Daniel's withdrawn nature. Additionally, it was not unreasonable for trial counsel to decline to present information about Daniel's depression because Daniel cannot establish that he was depressed at the time of the murders. Thus, the ACCA's finding is also not contrary to or an unreasonable application of Supreme Court precedent.

Even were the court to conclude that Daniel's trial counsel performed deficiently by failing to uncover and present evidence of Daniel's possible depression, Daniel cannot establish that the failure to present evidence of his alleged depression prejudiced him. Drs. Marson and Triebel's analysis of Daniel's depression as alleged in his habeas petition is not conclusive. That Daniel is currently depressed does not indicate that he suffered from depression at the time of the murders. That Daniel "likely" suffered from depression as a child does not indicate that Daniel has, in fact, suffered an on-going battle with depression. Accordingly, Daniel cannot establish that had the jury heard testimony akin to Drs. Marson and Triebel's, there is a reasonable probability that they would not have returned a death sentence. Thus, the ACCA's finding that Daniel failed to plead

that trial counsel's failure to present evidence of his alleged depression at the penalty phase prejudiced him is not an unreasonable determination of fact or contrary to or an unreasonable application of Supreme Court precedent.

### 9.   Failure to Introduce Available Evidence of Mental Illness in Daniel's Immediate Family

Daniel alleges that trial counsel should have provided "the jury with evidence of Mr. Daniel's immediate family's history of manic depression." Habeas Petition p. 49 (doc. 1) (citation omitted). Daniel claims that trial counsel should have presented evidence that Carolyn Daniel "suffered a severe depressive episode in her early adolescence and was hospitalized at the age of thirteen after the first of a series of suicide attempts." *Id.* at 50. Moreover, Daniel argues, had trial counsel adequately interviewed Carolyn Daniel,

> [s]he also would have told him that, when Mr. Daniel her son [sic] was seven years old, she experienced severe depression after learning of her adoptive mother's death, and also frequently was in tears and experienced nightmares about being chased by dead people and her own father at gunpoint (an event that actually occurred during Mrs. Daniel's childhood). Mrs. Daniel would have told Trial Counsel (as she told current counsel) that shortly thereafter, she was formally diagnosed with manic depression, and that doctors prescribed both Valium and Lithium to alleviate the severe mood swings she had suffered for years before. She elected to stop taking these medications soon after they were prescribed, however, because she did not like the way they made her feel.

*Id.* Daniel alleges that had trial counsel conducted a more in-depth interview with

82

Carolyn Daniel, "the jury would have heard that Mr. Daniel was raised by a single parent who suffered from an untreated psychological disorder that is thought to be hereditary and was frequently withdrawn and unavailable to her son during times of extreme need." Habeas Petition p. 50 (doc. 1). In his habeas petition, Daniel also argues that but for trial counsel's alleged failure, Daniel would not have been convicted of capital murder and sentenced to death. *Id.* at 51.

As to Daniel's argument that counsel was ineffective for failing to present evidence of his family's history of mental illness, the ACCA concluded that "Daniel failed to plead how the evidence of his mother's mental illness would have been relevant to mitigate the double homicide and how he was prejudiced by the failure to present this evidence. The full facts were not pleaded on this claim; therefore, according to Rule 32.6(d), Ala. R. Crim. P., it was correctly dismissed." *Id.* at 435. Because the ACCA determined that Daniel failed to meet the *Strickland* prejudice prong, the ACCA's judgment is subject to AEDPA review by this court.

As an initial matter, trial counsel clearly interviewed Carolyn Daniel at some point because he directed her examination during the penalty phase of the trial, eliciting specific responses to introduce mitigation evidence, and was criticized by Daniel for communicating with Mrs. Daniel too much. *See* Letter of

02/28/2003, C.R. Vol. 12, p. 236, Ex. B. Additionally, the court fails to see how Carolyn Daniel's hospitalization as a teenager, presumably before Daniel was even born, could have any bearing on Daniel murdering two people at the age of twenty-six. Moreover, the statutory aggravators relied on in Daniel's case–that he was serving a sentence for a felony at the time of the murders, that he killed two people in one course of conduct, and that he had a prior conviction–would not have been alleviated any by evidence of Daniel's mother's mental illness. Further, Daniel has nowhere in his habeas petition established that he suffers from manic depression, and the court will not assume that he harbors such a condition based on his mother's diagnosis. Moreover, that Daniel's mother was absent during periods of his upbringing and that she was not the most attentive and nurturing mother was made clear during her testimony during the penalty phase. In fact, Mrs. Daniel testified that she did nothing about the ongoing abuse that resulted in Daniel's kidney damage and subsequent removal from her home. Accordingly, there is no reasonable probability that more evidence concerning why she was an inattentive mother would have resulted in a different jury verdict.

Additionally, that bipolar disorder is thought to be hereditary does not indicate that Daniel himself suffered from it. The court again notes that the jury did hear that Carolyn Daniel was unavailable to her son during times of extreme

need – she testified that he was removed from her home and that she could not connect with Daniel when he seemed withdrawn. The line that Daniel now seeks to draw between his mother's manic depression and his act of murdering two people at twenty-six years of age is too tenuous to establish that he was prejudiced by trial counsel's failure to introduce this evidence. Accordingly, the ACCA's finding that Daniel failed to plead how he was prejudiced by trial counsel's failure to introduce evidence of his mother's mental illness was not an unreasonable determination of fact or contrary to or an unreasonable application of Supreme Court precedent.

### 10. Failure to Introduce Evidence of Severe Drug and Alcohol Addiction

Daniel claims that "[e]ven a cursory inspection of Mr. Daniel's arrest records by Trial Counsel should have alerted Trial Counsel to the fact that his client not only started drinking and using drugs at an early age, but also suffered from full blown alcohol and drug addiction and that these addictions were responsible for much of his antisocial behavior." Habeas Petition p. 51 (doc. 1). Daniel argues that he reported to the Alabama Board of Pardons and Paroles "that he suffered memory loss because of his alcohol and drug abuse and requested treatment for his addictions." *Id.* (citations omitted). Further, Daniel claims that

"Trial Counsel possessed documentation of this incident by the time of trial, yet appeared content simply to tell the jury that Mr. Daniel used drugs and alcohol." *Id.* at 51–52.

As to Daniel's claim that his counsel was ineffective for failing to present evidence of his drug and alcohol abuse, the ACCA concluded that

> [e]vidence concerning Daniel's use of drugs was presented to the jury through various witnesses at Daniel's trial. Jackson testified that they both had been drinking beer before the murders and that Daniel drank three or four beers. Also, the circuit court found as mitigation Daniel's history of substance abuse. There was no material issue of fact or law concerning this claim; thus, it was correctly summarily dismissed. *See* Rule 32.7(d), Ala. R. Crim. P.

*Daniel*, 86 So. 3d at 435 (citation omitted). Because the ACCA's determination was on the merits, this claim is subject to AEDPA review by this court. *See Borden*, 646 F.3d at 822 n. 44 (". . . [R]ather than find it insufficiently pled, the ACCA summarily dismissed it under Rule 32.7(d) because it failed to present a material issue of law or fact. This dismissal was on the merits, and therefore subject to AEDPA review by this court.").

This court agrees with the ACCA's finding that Daniel presented no material issue of law or fact because evidence of Daniel's drug and alcohol use was presented at trial. Daniel testified that he and Jackson hung out together four to five times a week, and that on these occasions they would drink and smoke

marijuana. C.R. Vol. 6, p. 683. Moreover, Carolyn Daniel testified that she observed Daniel's drinking problem when he was a teenager. C.R. Vol. 7, Tab 20, p. 902. That Daniel's trial counsel did not present evidence of Daniel's drug and alcohol abuse to the extent that Daniel's current counsel desires does not indicate that such evidence was not presented to the jury. Moreover, the court does not view trial counsel's decision not to focus on Daniel's drug and alcohol abuse as unreasonable given that such evidence might have been seen as damaging by the jury. *See Stewart*, 476 F.3d at 1217 (finding that "reasonably competent counsel may not present such evidence because a detailed account of a defendant's alcohol and drug abuse is invariably a 'two-edged sword.' We have repeatedly recognized that evidence of a defendant's alcohol or drug abuse holds little mitigating value and may have the counterproductive effect of alienating the jury. . . . Rarely, if ever, will evidence of a long history of alcohol and drug abuse be so powerful that every objectively reasonable lawyer who had the evidence would have used it.") (citations omitted). Accordingly, the court finds that the ACCA's finding is not an unreasonable determination of fact or contrary to or an unreasonable application of federal law.

Additionally, Daniel cannot establish that he was prejudiced by counsel's failure to adduce more evidence of his drug and alcohol abuse. Because the jury

already had knowledge of Daniel's drinking and drug use, more evidence concerning his drug and alcohol use would have been cumulative and unlikely to affect the result of the penalty hearing. Accordingly, because Daniel cannot establish that he was prejudiced by counsel's alleged deficient performance, the court finds that the ACCA's finding was neither contrary to nor an unreasonable application of Supreme Court precedent.

### 11.    Failure to Introduce Evidence of Extreme Poverty

Daniel's arguments in support of this claim are conclusory, relying on the following simple allegations:

> Trial Counsel also failed to procure human resources records showing that, at times during his childhood, Mr. Daniel's family depended upon food stamps or subsidies provided to them by the government. As set forth in detail in the Second Amended Petition, such evidence could and should have been obtained and presented to the jury. . . . Trial Counsel's failure to introduce evidence of Mr. Daniel's extreme poverty constituted a deficient performance that prejudiced Mr. Daniel. There is a reasonable probability that absent Trial Counsel's failure to introduce meaningful mitigating evidence Mr. Daniel would not have been convicted of capital murder and sentenced to death.

Habeas Petition p. 52 (citations omitted).

As to Daniel's claim that his counsel was ineffective for failing to present evidence that he was raised in extreme poverty, the ACCA concluded "Daniel failed to plead how he was prejudiced by counsel's failure to present evidence that

his childhood was marked by poverty or how it was relevant to mitigate the double homicide." *Daniel*, 86 So. 3d at 436. Because the ACCA finding involved a *Strickland* prejudice determination, it is subject to AEDPA review by this court.

As the ACCA properly noted, Daniel fails to plead how he was prejudiced by trial counsel's alleged deficiencies. The court cannot determine how failure to submit such evidence constituted unreasonable performance by Daniel's trial counsel. There is no reasonable probability that information about Daniel's poor upbringing would have worked against the statutory aggravating factors in his case. The jury had already heard about the severe and ongoing abuse Daniel suffered at the hands of his step-father, that he had been separated from his mother at a young age, that he used drugs and alcohol, that he began to seem withdrawn and like he was "hurting on the inside", that he suffered from learning disabilities as a child, and that his father died when he was three years old. Yet the jury still sentenced Daniel to death by a vote of ten to two. Thus, the court cannot conclude that had information about Daniel's dependence on food stamps or subsidies in his childhood been presented to the jury in the penalty phase of his trial, the jury would have returned a different verdict. Therefore, the ACCA's finding that Daniel failed to plead how he was prejudiced by counsel's failure to present evidence of his childhood poverty was neither an unreasonable determination of

fact nor contrary to or an unreasonable application of Supreme Court precedent.

### 12.    Failure to Introduce Evidence of Daniel's Non-Violent Character

In his habeas petition, Daniel argues that "[b]oth Mr. Daniel's mother and sister would have testified to Mr. Daniel's non-violent disposition and told the jury that Mr. Daniel never responded to verbal conflict with physical force and never played the role of aggressor." Habeas Petition p. 53 (doc. 1). As to Daniel's claim that his counsel was ineffective for failing to present evidence of his nonviolent character, the ACCA concluded that "[t]he record of Daniel's trial shows that counsel had knowledge of Daniel's criminal history – it was detailed in the presentence report. Counsel knew that the majority of Daniels' prior convictions were for nonviolent offenses." *Daniel*, 86 So. 3d at 437. The Court further noted that "when faced with overwhelming aggravating circumstances, trial counsel reasonably may conclude that the testimony of certain character witnesses would be of little help to the defense. *See Strickland* [*v. Washington*], 466 U.S. [668] at 699, 104 S.Ct. [2052] at 2070–2071 [(1984)]. This is particularly true if such testimony would open the door to presentation of damaging evidence by the prosecution." *Id.* (citations omitted) (alterations in original). Accordingly, the court concluded, "[t]here was no material issue of fact or law that would entitle

Daniel to relief. *See* Rule 32.7(d), Ala. R. Crim. P." *Id.* Because the ACCA

determined that Daniel failed to establish a material issue of fact or law that would

entitle him to relief, the court decided this claim on the merits and this claim is

therefore subject to AEDPA review by this court. *See Borden*, 646 F.3d at 822 n.

44 (". . . [R]ather than find it insufficiently pled, the ACCA summarily dismissed

it under Rule 32.7(d) because it failed to present a material issue of law or fact.

This dismissal was on the merits, and therefore subject to AEDPA review by this

court.").

In fact, Daniel's mother did testify to his nonviolent character, stating, "I

have to accept the decision that you've made because, you know, you made the

decision that you felt was right, but deep in my heart I know my child is innocent.

*He has not had a violent past*. He's done a lot of things since he moved away from

home, but murder was never one of them." C.R. Vol. 7, Tab 20, p. 903 (emphasis

added). Accordingly, Daniel has failed to establish that trial counsel performed

deficiently in this regard. Moreover, as the ACCA noted, trial counsel was not

unreasonable for failing to focus on Daniel's nonviolent character when the jury

had already found him guilty of capital murder. *See Strickland*, 466 U.S. at 699

("The aggravating circumstances were utterly overwhelming. Trial counsel could

reasonably surmise from his conversations with respondent that character and

psychological evidence would be of little help."). Thus, the court finds that the ACCA's ruling was neither contrary to nor an unreasonable application of Supreme Court precedent. Because the court finds that Daniel has clearly failed to establish deficient performance, it need not reach the question of whether he was prejudiced by any alleged deficiency.[10]

Even were the court to consider the prejudice issue, however, Daniel cannot establish that more evidence of his nonviolent character would have made a difference in the penalty phase when the jury had already concluded that Daniel was guilty of capital murder. Because Mrs. Daniel did testify to Daniel's nonviolent character, this court finds that there is not a reasonable probability that had additional information about Daniel's nonviolent character been admitted, the jury would not have sentenced Daniel to death. As the ACCA noted, "when faced with overwhelming aggravating circumstances, trial counsel reasonably may conclude that the testimony of certain character witnesses would be of little help to the defense. This is particularly true if such testimony would open the door to presentation of damaging evidence by the prosecution." *Daniel*, 86 So. 3d at 437 (citation omitted). Accordingly, the court finds that the ACCA's finding was not

---

[10] *See Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.").

contrary to nor an unreasonable application of Supreme Court precedent.

### 13.   Failure to Obtain Mitigation Expert

#### a.   Procedural Default

Respondent argues that "[a]lthough [Daniel] raised this claim as Claim III.C in the Rule 32 Petition, Daniel did not raise the following 'facts' in support of that claim before the Rule 32 court: (1) the allegation that Daniel's trial counsel failed to investigate grounds for mitigation, and (2) the allegation that Dr. Martha Loring would have been willing to testify at Daniel's trial." Response p. 32 (doc. 16). Although Daniel may not have stated this claim in the exact same words, Daniel argued throughout his Rule 32 petition that trial counsel failed to uncover mitigation evidence, and the ACCA addressed these claims throughout its opinion. *See, e.g.*, *Daniel*, 86 So. 3d at 431 (addressing claim that trial counsel was ineffective for *failing to explore* the possibility of Daniel's mental retardation); *id.* at 435–36 (addressing claim that "[t]rial counsel *failed to procure* human resources records" evincing Daniel's extreme poverty) (emphasis added). However, the court may not review the claim that Loring was willing to testify at Daniel's trial because Daniel did not plead that claim before the ACCA. *See* C.R. Vol. 19 p. 86 (stating that "Dr. Loring would have been expected to give the following testimony").

**b.      Merits**

Daniel alleges that had counsel performed effectively, he would have presented a "mitigation expert to explain the impact of such evidence to the jury." Habeas Petition p. 54 (doc. 1). Specifically, Daniel claims, Dr. Loring would have testified that:

- The profound abuse and trauma that Mr. Daniel experienced as a child and an adolescent had a strong impact on his subsequent growth and development. The events of Mr. Daniel's early life were risk factors that impeded his development and caused problems in his adulthood. Although certain of these risk factors were recognized by school, social service and medical authorities, the majority of them went undetected.

- Mr. Daniel was often left alone to deal with traumatic events and experienced extreme isolation and loneliness. Due to her untreated mental illness, Mr. Daniel's mother was unavailable to give her son comfort or provide him with a sense of security.

- The shame the Daniel children felt as a result of being forced to engage in sexual intercourse with each other made it impossible for them to form any sort of close bond. The children were unable to look each other in the eye, much less play together or experience healthy social interaction.

- Mr. Daniel experienced further isolation as a result of being placed in special classes in school, which made him feel "stupid." Mr. Daniel's school did not provide him the opportunity to participate in any activities to mitigate his feelings of stupidity or his sense of being different.

- Early on, Mr. Daniel assigned himself the responsibility of protecting his mother and spent the majority of his life trying to

save his mother from her own self-destructive tendencies and rescue her from the physical abuse she has endured at the hands of various men.

• When Mrs. Daniel was incarcerated for murdering his father, Mr. Daniel experienced feelings of failure, loneliness and anxiety.

• After his sister forced him to join a gang, Mr. Daniel's involvement in gang activities was that of a passive observer or look-out man.

• Mr. Daniel's development was severely handicapped and he did not learn skills of self-esteem and independence.

• To cope with the depression and terror caused by witnessing his mother shooting his father, the trauma caused by the sexual abuse and beatings he endured at the hands of Mr. Western, and his feelings of isolation and abandonment, Mr. Daniel created a sanctuary in his mind where no one could hurt him. Mr. Daniel has experienced and continues to experience visual and auditory hallucinations that he is part of a fantasy world where animals can speak and circus clowns make him laugh.

• Mr. Daniel's school records indicate that as a child he exhibited "bizarre behavior" in the form of laughing for no apparent reason. Such behavior is consistent with Mr. Daniel's disassociation into the safe place he has created for himself.

• Mr. Daniel currently experiences vivid flashbacks of his childhood beatings and rape. He has nightmares and struggles to avoid thinking about or speaking about his traumatic memories.

• Mr. Daniel's intellectual limitations are severe. He is unable to think through and solve problems effectively because of those limitations and his traumatic memories. The torture that Mr. Daniel has experienced has left him less able to find creative or effective solutions to problems than many who have led more

normal lives.

- Caught in a crisis situation, Mr. Daniel is far more inclined to retreat to his hallucinatory world and "zone out" than attempt to escape the situation, either by physically removing himself or refusing to take the blame for things he did not do.

Habeas Petition pp. 55–57 (doc. 1) (citations omitted).

Daniel argues that "[t]estimony by an expert like Dr. Loring about the impact of Mr. Daniel's severe history of privation and abuse, sexual molestation and rape, and diminished mental capacity unquestionably would have influenced the jury's appraisal of Mr. Daniel's moral culpability." *Id.* at 57. Daniel further claims that the ACCA's ruling involved an unreasonable determination of fact in that Daniel did plead that Loring would have been able to testify at the trial and Daniel alleged additional facts that could have been discovered through a mitigation expert. Reply Brief pp. 60–61 (doc. 23). Daniel also claims that the ACCA's ruling involved an unreasonable application of Supreme Court precedent because even though effective assistance of counsel does not require a mitigation expert in all cases, "it was unreasonable for the CCA to determine that an expert was not required in Daniel's case given the volume and nature of mitigating evidence involved . . . ." *Id.* at 61–62.

As to Daniel's claim that counsel was ineffective for failing to procure the

96

assistance of mitigation expert Martha Loring, the ACCA concluded that "Daniel did not plead that Loring was available to testify at Daniel's trial. Nor did he plead any facts in his petition that, if true, would establish that it was objectively unreasonable for trial counsel not to hire a mitigation expert. He alleged no additional facts that the mitigation expert could have discovered that he could not have discovered. This claim was correctly summarily dismissed as it failed to meet the pleading requirements of Rule 32.6, Ala. R. Crim. P." *Id.* at 437–38. Because the ACCA determined that Daniel failed to meet Rule 32.6's pleading requirements, that judgment was on the merits and this claim is, therefore, subject to AEDPA review by this court. *See Borden*, 646 F.3d at 812 ("A ruling by an Alabama court under Rule 32.6(b) is . . . a ruling on the merits.").

The ACCA is correct that Daniel did not plead that Loring would have been available to testify. In his appellate brief to the ACCA, Daniel argued that "[a]t a hearing of Mr. Daniel's Rule 32 Petition, Dr. Loring would have been expected to give" the testimony he recites in his habeas petition. *See* C.R. Vol. 19, Tab 49, p. 86. Yet the ACCA correctly concluded that Daniel did not plead that Loring was available and willing to testify at Daniel's trial. Accordingly, trial counsel did not perform unreasonably in failing to procure her services. This conclusion, then, was not an unreasonable determination of fact as Mr. Daniel suggests.

Moreover, the ACCA's conclusion that Daniel failed to allege any "additional facts that the mitigation expert could have discovered that [Daniel] could not have discovered" was also not an unreasonable determination of fact. Daniel had firsthand knowledge of all the information that he pleads in his petition–i.e, his impoverished upbringing, his childhood abuse, his drug and alcohol use, his mother's mental illness, his borderline mental retardation–and a mental health expert would not have discovered more information concerning this mitigation evidence than Daniel already had. The court is also unpersuaded by Daniel's argument that in his case, effective assistance of counsel required a mitigation expert. Daniel's trial counsel established a wealth of mitigation evidence during the penalty phase through the testimony of Carolyn Daniel. Accordingly, the court fails to see what a mitigation expert could have added to this testimony. Moreover, Daniel claimed that he did not commit the crime. Carolyn Daniel testified at the penalty phase that she did not believe that Daniel committed the crime and that Daniel had always had a nonviolent character. Daniel also testified *throughout* the guilt phase that he did not commit the murders. Accordingly, the court disagrees that trial counsel performed deficiently by failing to enlist the services of an expert to assist in the appraisal of Daniel's moral culpability for a crime that he, by his own testimony, did not commit. Thus,

the ACCA finding was neither an unreasonable determination of fact nor contrary to or an unreasonable application of Supreme Court precedent.

Further, Daniel cannot establish prejudice because he cannot demonstrate that had trial counsel enlisted the services of a mitigation expert, there is a reasonable probability that the jury would not have sentenced Daniel to death. Daniel testified in his own defense that he did not commit the murders. Moreover, he implicated Jackson in the crimes. Therefore, the court cannot conclude that Daniel was prejudiced by his attorney's failure to secure a mitigation expert to testify about how the jury should adjudge Daniel's so-called "moral culpability." *See Parker v. Sec'y for Dep't of Corr.*, 331 F.3d 764, 788 (11th Cir. 2003) ("Considering the limited value of the mitigating evidence Parker claims should have been introduced, and the fact that such evidence was often inconsistent with other evidence already before the court, we conclude Parker's attorneys were reasonable in relying on lingering doubt and not introducing this other potentially mitigating evidence."). The court fails to see how the testimony Daniel alleges the mitigation expert would have provided would have "been critical in terms of persuading the jurors that Mr. Daniel's life should be spared." Habeas Petition p. 54 (doc. 1). Rather, the jury had heard the Carolyn Daniel's extensive testimony about Daniel's troubled upbringing and still sentenced him to death.

The court also notes that Daniel's contention that a mitigation expert would have made it likely that the jury would have spared Daniel's life is an oversimplification of the sentencing process under Alabama law. Rather, a change in one juror's vote would have resulted in a mistrial of the sentence hearing, not a vote for life imprisonment. Alabama Code §13A-5-46(f) requires that "[t]he decision of the jury to return an advisory verdict recommending a sentence of life imprisonment without parole must be based on a vote of a majority of the jurors." In Daniel's case, then, he would have needed at least seven votes in favor of life imprisonment in order to receive such a sentence. Given that two jurors voted against the death penalty, Daniel would still have needed five additional jurors to vote in favor of life imprisonment to receive such a sentence. The statute further mandates that

> [i]f the jury is unable to reach an advisory verdict recommending a sentence, or for other manifest necessity, the trial court may declare a mistrial of the sentence hearing. Such a mistrial shall not affect the conviction. After such a mistrial or mistrials another sentencing hearing shall be conducted before another jury, selected according to the laws and rules governing the selection of a jury for the trial of a capital case.

*Id.* at §13A-5-46(g). Accordingly, the court finds that Daniel cannot establish that but for counsel's failure to secure the help of a mitigation expert, there is a reasonable probability that the jury would not have sentenced Daniel to death.

14.     **Failure to Present Other Witnesses During the Penalty Phase**

Daniel argues that trial counsel performed deficiently by failing to call Tammi Daniel, Daniel's sister, as a witness during the penalty phase of trial. Daniel claims that "Trial Counsel's choice to have Ms. Daniel testify at the sentencing hearing establishes that Trial Counsel believed her testimony would be helpful to Mr. Daniel and further highlights the fact that Trial Counsel unreasonably failed to prepare for the penalty phase of Mr. Daniel's trial." Habeas Petition p. 58 (doc. 1). Daniel also argues that trial counsel performed deficiently by failing to present testimony from Spencer Sims, McCulloch's stepfather, asking that Daniel's life be spared. According to Daniel, "Mr. Sims unequivocally told the Circuit Court that, despite his grief and anguish at having his child taken from him, he did not want Mr. Daniel to receive a death sentence. Trial Counsel's failure to elicit testimony from Mr. Sims during the penalty phase–attributable to his complete ignorance as to how helpful that testimony would be to his client–is inexcusable." *Id.* at 58–59. Daniel argues that "[t]he absence of testimony from the family of one of the victims asking that Mr. Daniel's life be spared before the jury, unquestionably influenced the outcome of Mr. Daniel's case." *Id.* at 59.

As to Daniel's argument that his counsel was ineffective for failing to

present testimony of other witnesses during the penalty phase, the ACCA

concluded that "Daniel failed to plead what testimony Daniel's sister could have

presented at the sentencing hearing before the jury–he failed to plead the full facts

in support of his claim. *See* Rule 32.6(b), Ala. R. Crim. P." *Daniel*, 86 So. 3d at

438. Moreover, the court noted, "the record shows that the State called Sims at the

judicial sentencing hearing and Sims requested that the court spare Daniel's life.

Tammi Daniel also testified at the judicial sentencing hearing and asked the court

to spare her brother's life. Daniel asserts that counsel was ineffective for failing to

present this evidence in the penalty phase hearing that was held before the jury."

*Id.* at 438. The court noted, however, that the "opinion of a relative of a victim is

irrelevant to the jury's determination of whether the death penalty should be

imposed. Such testimony is calculated to incite arbitrary response from the jury."

*Id.* (citations and quotation marks omitted). Accordingly, the court concluded,

"[c]ounsel is not ineffective for failing to present inadmissible evidence. This

claim was correctly dismissed because it presented no material issue of fact or law

that would have entitled Daniel to relief. *See* Rule 32.7(d), Ala. R. Crim. P." *Id.*

(citation omitted). Because the ACCA determined that Daniel failed to establish a

material issue of fact or law that would entitle him to relief on this claim, the

court's decision was on the merits and is, therefore, subject to AEDPA review by

this court. *See Borden*, 646 F.3d at 822 n. 44 (". . . [R]ather than find it insufficiently plead, the ACCA summarily dismissed it under Rule 32.7(d) because it failed to present a material issue of law or fact. This dismissal was on the merits, and therefore subject to AEDPA review by this court.").

Carolyn Daniel testified to a wealth of mitigation evidence. That other witnesses were not there to also testify about this evidence does not mean that the evidence was not adequately presented or that trial counsel performed deficiently in that regard. Daniel fails to establish what additional evidence Tammi Daniel would have provided that Carolyn Daniel did not provide in her testimony. Moreover, in *United States v. Brown*, 441 F.3d 1330, 1351(11th Cir. 2006), the Eleventh Circuit noted that in *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), the Supreme Court found that "the Eighth Amendment erects no *per se* bar against the introduction of victim impact evidence." *Brown*, 441 F.3d at 1351.  Yet the court further noted that the *Payne* holding is limited to the admission of such evidence *at the sentencing hearing* and that "the *Booth* prohibition against evidence of family members' opinions and characterizations of the crime, the defendant, and the appropriate sentence remains good law." *Id. See also Hain v. Gibson*, 287 F.3d 1224, 1238–39 (10th Cir. 2002) (expressly recognizing "that the portion of *Booth* prohibiting family members of a victim from stating 'characterizations and

opinions about the crime, the defendant, and the appropriate sentence' during the penalty phase of a capital trial survived the holding in *Payne* and remains valid"). Accordingly, such testimony from Mr. Sims would have been inadmissible during the penalty phase of the trial and the ACCA's finding is not contrary to or an unreasonable application of Supreme Court precedent.

Additionally, Daniel fails to establish that he was prejudiced by trial counsel's alleged deficiencies. Had trial counsel presented other witnesses to testify about the issues he presents in his habeas petition, it is likely that the other witnesses' testimony would be cumulative of Carolyn Daniel's testimony, e.g., evidence of Daniel's abuse at the hands of his step-father, Daniel's drug and alcohol abuse, Daniel's non-violent character. Thus, Daniel cannot establish that he was prejudiced by trial counsel's failure to present other witnesses' testimony and the ACCA finding is not an contrary to or an unreasonable application of Supreme Court precedent.

### 15. Failure to Challenge State's Introduction of a Statutory Aggravator

Daniel claims that the ACCA unreasonably applied *Rompilla* in deciding that *Rompilla* was distinguishable from Daniel's case because Daniel failed to plead that any mitigating evidence existed in Daniel's prior burglary file. Reply

Brief p. 67 (doc. 23). Daniel further claims that his trial counsel should have investigated the underlying rape element of his burglary conviction, and the failure to do so cannot be considered a strategic decision when it was not the result of reasonable investigation into circumstances of Daniel's prior conviction. *Id.* at 69.

Daniel also challenges the voluntariness of the guilty plea he entered on the second degree burglary charge, arguing that the fact that his attorney in the burglary case "had no idea her client was pleading guilty to attempted rape is persuasive evidence that Mr. Daniel's alleged plea to this underlying offense was uninformed and therefore involuntary. Such evidence should have been presented to the jury." Habeas Petition p. 64 (doc. 1). Daniel further argues that

> effective counsel who was aware of the facts surrounding this supposed aggravating factor would have retained the assistance of an expert such as Dr. Loring to help the jury better understand the circumstances, including the effect of police interrogation, contributing to Mr. Daniel's 'voluntariness' in changing his plea from not-guilty to guilty. The failure to introduce the true facts about Mr. Daniel's prior conviction is particularly egregious and unquestionably prejudicial to Mr. Daniel because there was no other evidence that Mr. Daniel was a violent person or predisposed to commit a violent act.

Habeas Petition p. 65 (doc. 1). However, Daniel also claims that he "does not contend that his trial was the appropriate forum for challenging the validity of his prior guilty plea . . . ." *Id.* at 64 n. 15.

As to the claim that trial counsel was ineffective for challenging the state's

introduction of a statutory aggravator, the ACCA concluded that "the *Rompilla* Court noted that the file of Rompilla's prior burglary conviction contained a veritable cornucopia of potential mitigating evidence concerning Rompilla's childhood and mental illness." *Daniel*, 86 So. 3d at 439. Moreover, the court concluded,

> [u]nlike *Rompilla*, Daniel did not plead that any such information existed in the file from Daniel's prior conviction. Also, in this case the State did not emphasize the prior conviction nor introduce any evidence concerning the prior conviction. This case is factually distinguishable from *Rompilla*. Given that counsel was aware of the prior burglary conviction and that the underlying offense was rape, counsel could have made a strategic decision to not call further attention to that conviction by introducing specific details about the attempted burglary conviction. Daniel failed to plead sufficient facts to support a *Rompilla* claim. *See* Rule 32.7(d), Ala. R. Crim. P.

*Id.* at 439–40 (citation omitted). Because the ACCA determined that Daniel failed to plead facts to support a claim under Supreme Court precedent and the ACCA's decision relied on Alabama Rule 32.7(d), the court's decision was on the merits and, therefore, subject to AEDPA review by this court. *See Borden*, 646 F.3d at 822 n. 44.

Counsel's decision not to challenge the prior burglary was not wholly unreasonable, and, therefore, the ACCA's ruling was neither contrary to or an unreasonable application of Supreme Court precedent. The court agrees with Mr.

Daniel that his capital murder trial was not the proper forum to challenge the voluntariness of his prior burglary conviction to which he pleaded guilty many years before. Accordingly, the court finds unavailing Daniel's claim that his attorney performed deficiently by not enlisting the services of an expert to explain how Daniel's confession may not have been voluntary. Daniel, in fact, pleaded guilty to the prior burglary offense, and the case action summary, which was admitted into evidence at his trial, stated that the charge was attempt to commit rape. *See* R. Vol. 2, Case Action Summary, p. 314 ("Defendant withdraws his plea of not guilty, heretofore entered in this cause, waives a jury trial and pleads guilty to Burglary 2° as charged in the indictment."). The indictment, also in evidence, charged as follows:

> The grand jury of said county charge that, before the finding of this indictment, RENARD MARCEL DANIEL, whose name is to the grand jury otherwise unknown, did unlawfully enter the lawfully occupied dwelling house of Bonnie Stevenson, with intent to commit a theft or felony therein, to-wit: Rape . . . in violation of Section 13A-7-6(b) of the Alabama Criminal Code, against the peace and dignity of the State of Alabama.

*Id.* at 318.

The court also notes that although Daniel claims that his trial counsel should have interviewed the victim of the burglary, Bonnie Stevenson, about the circumstances surrounding the burglary charge, by Daniel's own admission, such

testimony would have been damaging. Daniel notes that Stevenson "does recall Mr. Daniel yelling that he had a gun and that he would rape an inhabitant of her home if he gained access . . . ." Habeas Petition p. 63 (doc. 1). Certainly, it could not be unreasonable for trial counsel not to introduce such testimony or not to introduce Bonnie Stevenson as a witness if her testimony would have been that she recalled Daniel threatening to rape her if he gained access to her home. Accordingly, because Daniel cannot establish that it was unreasonable for his trial counsel not to introduce more facts concerning the second-degree burglary charge, Daniel cannot establish that his attorney performed deficiently.

Moreover, in *Rompilla*, 545 U.S. 374, 390, the Supreme Court noted that if "the defense lawyers had looked in the file on Rompilla's prior conviction, it is uncontested they would have found a range of mitigation leads that no other source had opened up. . . . The prison files pictured Rompilla's childhood and mental health very differently from anything defense counsel had seen or heard." Here, unlike in *Rompilla*, Daniel's case file for the prior burglary contained no such mitigation evidence. Daniel's trial counsel, unlike the attorneys in *Rompilla*, did investigate Daniel's prior conviction and childhood.

Finally, Daniel's trial counsel did object to the state's introduction of the burglary conviction as a statutory aggravator, stating: "Judge, I'm going to object

at this time to the burglary, Judge, because there's been no evidence and the State has not put on – whether he broke into a person's home." C. R. Vol. 7, Tab R. 21, p. 906. The trial court overruled trial counsel's objection finding that "there is a case action – a certified case action summary sheet where the defendant pled guilty to burglary in the second degree where the charge was with attempt to commit rape therein. That document is in evidence. It's up to the jury to determine whether that establishes that particular aggravating factor." *Id.* Accordingly, this court finds that the ACCA's finding was not an unreasonable determination of fact nor was it contrary to or an unreasonable application of Supreme Court precedent.

Even if Daniel could establish that trial counsel performed deficiently by failing to challenge the state's introduction of the statutory aggravator, Daniel cannot establish that he was prejudiced by any such deficiency. Daniel pleaded guilty to burglary where the charge was with intent to commit rape therein, trial counsel was aware of the prior charge and did challenge the state's reliance on the conviction, and Daniel's postconviction counsel's interview with Bonnie Stevenson revealed that she remembered hearing Daniel threaten to rape her if he gained access to her home. Daniel's case, unlike the defendant's in *Rompilla*, would not have been bolstered by a wealth of mitigation evidence hidden in his case file. Accordingly Daniel cannot establish that had trial counsel conducted

further inquiry into his prior burglary and introduced such evidence, there is a reasonable probability that the jury would not have sentenced him to death.

### 16.   Trial Counsel's Closing Argument Was Deficient and Prejudicial

Daniel argues that the ACCA's determination that trial counsel's closing statements were not prejudicial was an unreasonable determination of federal law. "In his closing argument, Trial Counsel made remarks to the jury about Mr. Daniel's 'early delinquency,' thereby informed the jury of Mr. Daniel's juvenile record—a fact that the State never referred to or brought into evidence." Habeas Petition p. 66 (doc. 1) (citation omitted). Moreover, Daniel argues, "Trial Counsel's iteration of his 'understanding' during his closing that some of the jury members already had made up their minds about his client's fate was wholly inappropriate and could have led the jury to conclude that deliberations were unnecessary." *Id.* (citation omitted). Daniel also claims that trial counsel performed deficiently by "express[ing] discomfort with asking the jury to vote against the death penalty . . . ." *Id.* (citation omitted). Daniel further argues that his trial counsel informed the jury to "disregard certain potentially mitigating factors in Mr. Daniel's upbringing." *Id.* at 66–67. Trial counsel stated that the prosecution found that such information "is insignificant. And it may be." *Id.* at 67 (citation

omitted).

As to the claim that counsel was ineffective for presenting a deficient and prejudicial closing argument, the ACCA concluded that "Daniel failed to plead what argument counsel could have made that would have resulted in a different sentencing recommendation in this case or how he was prejudiced; thus, he failed to comply with Rule 32.6, Ala. R. Crim. P." *Daniel*, 86 So. 3d at 440. Because the ACCA's determination involved a *Strickland* prejudice finding, the judgment was on the merits, and this claim is, therefore, subject to AEDPA review by this court.

The court finds unavailing Daniel's argument that trial counsel erred by referencing Daniel's "early delinquency." Habeas Petition p. 66 (doc. 1). In relying on the statutory aggravator that Daniel was previously convicted of another capital offense or felony involving the use or threat of violence to the person, the State referenced Daniel's prior convictions including selling cocaine, receiving stolen property, and second degree burglary. *See* Vol. 7, Tab 21, p. 905. Accordingly, trial counsel did not perform unreasonably by referencing Daniel's "early delinquency" which the State clearly put into issue. Moreover, the court finds that Daniel's reading of the closing argument is incorrect. Trial counsel did not simply express discomfort with asking the jury to spare Daniel's life. Rather, trial counsel expressed discomfort with begging stating, "To be honest with you,

111

I'm really not a beggar." C.R. Vol. 7, Tab 22, pp. 907–08. Even if Daniel's trial counsel did reference Daniel's culpability, this would not necessarily be an unreasonable action because doing so could constitute an attempt to establish credibility with the jury. *See Carter v. Johnson*, 131 F.3d 452, 466 (5th Cir. 1997) ("counsel may make strategic decisions to acknowledge the defendant's culpability and may even concede that the jury would be justified in imposing the death penalty, in order to establish credibility to the jury.").

This court also disagrees with Daniel's contention that trial counsel admitted that Daniel's mitigating evidence was insignificant. Trial counsel, in fact, argued that such mitigating factors were not insignificant to him or Daniel's mother:

> [Defense Counsel]: . . . . The prosecutor tells you to disregard this guy had a violent past. Just disregard it. Say forget about the fact that early on he was beat, or that early on that he had problems, early on he was taken from his mother, early on in life he was put in foster care. They are saying that is insignificant. And it may be.
>   It's not insignificant to the young lady that testified a few minutes ago. And it's not insignificant to me. . . .

C.R. Vol. 7, Tab 23, p. 908–09. Although Daniel truncates his trial counsel's statement with the assertion that his upbringing may be insignificant, trial counsel clearly went on to state that Daniel's upbringing was not insignificant to his mother or to trial counsel himself. Accordingly, this court disagrees with Daniel's

112

allegation that trial counsel "invit[ed] the jury to disregard mitigating evidence . . . ." Reply Brief p. 71 (doc. 23).

Daniel's reliance in his reply brief on *Dobbs v. Turpin*, 142 F.3d 1383, 1389 (11th Cir. 1998), is misplaced as trial counsel in that case did far more than simply express discomfort with asking jurors to impose the death penalty as Daniel would have us believe. In *Dobbs*, trial counsel committed several infractions including: arguing "at sentencing that 'there ha[d] been more or less a moratorium as far as death sentences are concerned,' that Georgia had not executed anyone in more than seven years and that he believed the Supreme Court would attack Georgia's then recently-enacted death penalty statute"; failing to ask "the jury to have mercy on Dobbs, to spare Dobbs's life or to sentence Dobbs to life imprisonment[,]" instead, merely asking "the jury to impose a sentence with which they could live"; and "reading verbatim from a portion of Justice Brennan's concurring opinion in *Furman v. Georgia*." *Dobbs*, 142 F.3d at 1389.

Certainly, Daniel's trial counsel's closing argument was not so egregious. In fact, Daniel's attorney specifically asked the jury to spare his life. Trial counsel ended his closing argument as follows:

> And now at this point all I'm asking you to do is that when you go back
> – I'm pretty sure y'all know what life without is. It's just what it says.
> He will be in prison the rest of his life. He will not be out next week. He

> will not be out next year. The rest of his life. It's just what it says.
> *I ask you to spare his life*, but it's your call. Thank you.

C.R. Vol. 7, Tab 23, p. 909 (emphasis added). Contrary to Daniel's claim, trial counsel specifically asked that Daniel's life be spared and that he be sentenced to life imprisonment without parole. Accordingly, the court finds meritless Daniel's argument that his trial counsel performed unreasonably in delivering his closing argument.

Daniel posits that "[b]ecause the jury's vote in favor of the death penalty was only 10 to 2, despite Trial Counsel's deficient performance, there is a reasonable probability that, had counsel not made these prejudicial closing remarks, Daniel would not have been sentenced to death." Reply p. 71 (doc. 23). The court finds Daniel's argument here to be misleading as a change in one juror's vote would have resulted in a mistrial of the sentence hearing rather than a vote for life imprisonment. Alabama Code §13A-5-46(f) requires that "[t]he decision of the jury to return an advisory verdict recommending a sentence of life imprisonment without parole must be based on a vote of a majority of the jurors." In Daniel's case, then, he would have needed at least seven votes in favor of life imprisonment in order to receive such a sentence. Given that two jurors voted against the death penalty, Daniel would still have needed five additional jurors to vote in favor of

life imprisonment to receive such a sentence. The statute further mandates that

> [i]f the jury is unable to reach an advisory verdict recommending a sentence, or for other manifest necessity, the trial court may declare a mistrial of the sentence hearing. Such a mistrial shall not affect the conviction. After such a mistrial or mistrials another sentencing hearing shall be conducted before another jury, selected according to the laws and rules governing the selection of a jury for the trial of a capital case.

*Id.* at §13A-5-46(g).

Finally, the court disagrees with Daniel's contention that the ACCA should have considered the totality of trial counsel's allegedly prejudicial closing marks in conjunction with trial counsel's other deficient performance of failing to present mitigating evidence. Reply Brief p. 72 (doc. 23). Because this court finds that Daniel's trial counsel neither failed to present mitigating evidence nor made prejudicial closing remarks, the court finds that the ACCA's ruling was not contrary to nor an unreasonable application of clearly established federal law.

### 17. Trial Counsel's Deficient Performance During the Penalty Phase Prejudiced Mr. Daniel

#### a. Procedural Default

Daniel did not present this claim to the ACCA as he presents it here. As the respondent concedes, however, although the ACCA "failed to address this claim directly, . . ." the claim "is cumulative of other penalty-phase claims before it." Response p. 41 (doc. 16). Thus, argues the respondent, "[t]he state-court findings

115

of fact on the related claims, as well as the transcript from the state court

proceedings, constitute the proper factual basis for consideration of this claim." *Id.*

Nevertheless, where the State does not explicitly waive procedural default, it is not

waived. Under 28 U.S.C. § 2254(b)(3), "[a] State shall not be deemed to have

waived the exhaustion requirement or be estopped from reliance upon the

requirement unless the State, through counsel, expressly waives the requirement."

*See also Dill v. Holt*, 371 F.3d 1301, 1302 n. 1 (11th Cir. 2004) (stating that

AEDPA requires a court to address exhaustion when it is not expressly waived by

the State). The court, however, agrees that Daniel raised this issue in his state

postconviction petition and that a reasonable reader would understand this claim's

particular legal basis and factual foundation to be the same as the various claims

for deficient performance presented to the ACCA. Accordingly, the court finds

that Daniel's claim that his trial counsel's overall deficient performance during the

penalty phase prejudiced him is not barred for failure to exhaust the claim before

the state court.

### b.      Merits

The court has found each of Daniel's ineffective assistance of counsel

claims unavailing and therefore finds that he was not prejudiced by the totality of

his trial counsel's alleged deficiencies during the penalty phase. For instance,

116

Daniel, in this portion of his petition, again argues that "[n]ever once did Counsel affirmatively argue that Mr. Daniel's life should be spared." Habeas Petition p. 69 (doc. 1). The court, however, previously noted that trial counsel did specifically ask that his client's life be spared by concluding his closing argument saying "I ask you to spare his life, but it's your call. Thank you." C.R. Vol. 7, Tab 23, p. 909. Because the court finds that trial counsel did not perform deficiently and such alleged deficiencies did not prejudice Daniel, the court finds that the totality of trial counsel's alleged failures did not prejudice Daniel. *See also United States v. Murray*, 154 Fed. Appx. 740, 745 (11th Cir. 2005) ("To establish cumulative error, each alleged incident must constitute error in itself . . . .).

### B.  Ineffective Assistance of Counsel During Guilt Phase

#### 1.  Failure to Conduct Meaningful Investigation of the Case

As to this claim, Daniel argues that "[i]t is clear from even a cursory review of the record in this case that Trial Counsel barely put forward any effort in defending Mr. Daniel." Habeas Petition p. 71 (doc. 1). Daniel further argues that "Trial Counsel failed to interview any of the State's witnesses before trial, including the State's star witness, George Jackson." *Id.* at 72. Daniel further claims that "at a bare minimum, there is a reasonable probability that the outcome of the proceedings would have been different had Mr. Jackson's credibility as a

witness and as an innocent bystander been challenged." *Id.* (citations omitted).

Moreover, Daniel argues, "Trial Counsel also failed to adequately investigate the

findings of the various police officers called as witnesses for the State by talking

to those officers before they gave testimony against his client." *Id.* Had they done

so, Daniel claims that trial counsel "would have learned of the slipshod

investigation conducted by the Birmingham Police Department ("BPD") and its

effort to tailor that investigation to facilitate Mr. Daniel's conviction." *Id.*

In reviewing the trial court's denial of Daniel's Rule 32 Petition, the ACCA

determined that "Daniel failed to plead what evidence counsel could have

uncovered that would have discredited Jackson's testimony or that Jackson would

have even spoken to Daniel's attorneys, given that Daniel's entire defense was that

Jackson, and not he, committed the double homicide." *Daniel*, 86 So. 3d at 416.

Accordingly, the court reasoned, "Daniel failed to satisfy his burden of pleading

full facts under Rule 32.3, Ala. R. Crim. P., and Rule 32.6(b), Ala. R. Crim. P." *Id.*

(citation omitted). Because the ACCA's decision rested on Alabama Rule of

Criminal Procedure 32.6(b), this judgment was on the merits and this claim is,

therefore, subject to AEDPA review by this court. *See Borden*, 646 F.3d at 812

("A ruling by an Alabama court under Rule 32.6(b) is . . . a ruling on the merits.").

As to Daniel's claim that his counsel failed to review police officers' findings, the

ACCA concluded that "Daniel failed to identify, by name, any police officer whose findings counsel should have investigated." *Id.* at 417. Daniel, the court said, "failed to comply with the specificity requirements of Rule 32.6, Ala. R. Crim. P." *Id.* Moreover, the court noted, "[t]he failure to interview or take the depositions of the State's witnesses for impeachment purposes is not prejudicial per se." *Id.* (quotation marks and citations omitted). Because the ACCA's finding involved a *Strickland* prejudice determination, it was on the merits and subject to AEDPA review by this court.

Importantly, trial counsel attacked Jackson's credibility extensively, drawing attention to the inconsistencies in his account of the night of the crime. *See, e.g.*, C.R. Vol. 6, p. 641 (trial counsel eliciting from Sergeant Echols testimony that Jackson never told her the bit about barricading himself in his apartment and hearing a woman yell "Are you alright?"); C.R. Vol. 4, pp. 243 (trial counsel eliciting testimony from Jackson that he did not initially tell the police about seeing the blood and fire); C.R. Vol. 4, pp. 245–46 (trial counsel drawing into question Jackson's claims that he barracaded himself in his apartment after the murders because he was afraid of Daniel, but that he later opened the door for Daniel). Additionally, trial counsel did call into question the BPD's investigation of the crime. Specifically, trial counsel focused on the chain

of custody of the car, questioning whether someone else could have planted the shoes in the car. C.R. Vol. 5, pp. 444–45. Moreover, trial counsel questioned the experts, making clear that they could not conclusively say who committed the crime. *See, e.g.*, C.R. Vol. 5, p. 484–85 (forensic scientist John Case could not say conclusively that the shoes recovered from the car made the impressions at the crime scene); *id.* at 511 (latent print examiner David George testifying on cross-examination that the two prints from the crime scene that could be matched to Daniel were retrieved from beer bottles). Trial counsel also called attention to the fact that the BPD never searched Daniel's apartment for trace evidence or searched Daniel's hands for gunshot residue. *Id.* at 460–61. Daniel argues that "[w]here as here, counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, a defendant's Sixth Amendment rights are violated." Habeas Petition pp. 72–73 (doc. 1). Considering the foregoing, however, the court finds such an assertion tenuous, to say the least.

Even if Daniel could establish that trial counsel performed deficiently by failing to conduct a meaningful investigation of his case, Daniel cannot establish that this alleged deficiency prejudiced him. As discussed above, trial counsel attacked Jackson's credibility extensively, drawing attention to the inconsistencies in his account of the night of the crime. Moreover, Daniel testified as to the events

120

of the night, giving a synopsis of the crime and clearly implicating Jackson in the murders. Trial counsel also drew out the lack of conclusions in the experts' testimony and noted the potential problems with the Birmingham Police Department's investigation of the case. Accordingly, Daniel cannot establish that had trial counsel further investigated the testimony of the state's witnesses, there is a reasonable probability that the jury would not have found him guilty of capital murder. Thus, the ACCA's finding was not an unreasonable determination of fact or contrary to or an unreasonable application of Supreme Court precedent.

### 2.   Failure to Collaborate with Daniel on His Defense

### a.   Procedural Default

Respondent argues that "Daniel did not raise the following 'facts' in support of [this] claim before the Rule 32 court: (1) Daniel made desperate attempts to contact his trial counsel; (2) Daniel discussed the matter with 'Doc' Lane, a fellow inmate; (3) Lane drafted letters to counsel on Daniel's behalf; and (4) had counsel met with Daniel more frequently before trial, Daniel would have given them more information about his alleged childhood abuse." Response p. 44 (doc. 16) (footnote omitted). As to the contentions that Daniel discussed his issues with "Doc" Lane and that Lane drafted letters on Daniel's behalf, the court finds that these claims are procedurally barred from review as Daniel failed to present these

claims before the ACCA. *See* Brief of the Appellant pp. 27–28, C.R. Vol. 19, Tab 49. Although Daniel presented these allegations in his Second Amended Rule 32 Petition, C.R. Vol. 11, Tab 36, p. 9, n.1, Daniel did not present them in his brief before the ACCA. Accordingly, because Daniel did not give the ACCA the opportunity to review these claims, Daniel did not properly exhaust these factual allegations before the state court and this court is procedurally barred from reviewing them.

However, this court finds that the claim that Daniel made desperate attempts to contact his trial counsel is not procedurally barred. The ACCA addressed the allegation that Daniel made desperate attempts to contact his attorney, noting that "[i]n Daniel's second amended petition he pleaded that his attorneys failed to answer his requests for a meeting and did not meet with him until three days before his trial began. In support of this contention Daniel attached to his petition copies of three letters he wrote to counsel." *Daniel*, 86 So. 3d at 417.

Additionally, the court finds that Daniel properly exhausted the claim that had trial counsel collaborated more with Daniel on his defense, counsel would have learned more about Daniel's childhood abuse. Although Daniel did not present this claim to the ACCA in this part of his brief under this particular heading, Daniel did present this claim elsewhere in his brief. In the brief section

wherein Daniel argues that trial counsel should have presented evidence of Daniel's childhood abuse at the penalty phase, Daniel pleaded in both his habeas petition and appellate brief before the ACCA that "[i]nformation about the true extent of the physical abuse Mr. Western heaped on the Daniel children, and Mr. Daniel in particular, was readily available to Trial Counsel from Mr. Daniel himself and Mr. Daniel's older sister, Tammi. Had Trial Counsel asked either of them about Mr. Western's physical abuse of Mr. Daniel, he would have learned that Mr. Western beat Mr. Daniel regularly and far more severely than any of the other children in the household." Habeas Petition pp. 32–33 (doc. 1); Brief of the Appellant p. 68, C.R. Vol. 19, Tab 49. Accordingly, the court finds that a reasonable reader would understand the particular legal basis and specific factual allegation underlying this claim and that this allegation is not procedurally barred from review.

### b.    Merits

Daniel argues that "Trial Counsel first met Mr. Daniel at the preliminary hearing for his capital case in October of 2001. The next time Trial Counsel spoke to Mr. Daniel was sixteen months later–just three days before the commencement of Mr. Daniel's capital trial. In the interim, Mr. Daniel made repeated–and unsuccessful–efforts to participate in his own defense." Habeas Petition p. 73

(doc. 1). Daniel claims that when he could not reach trial counsel, he "contacted the Alabama Bar Association to request copies of complaint forms." *Id.* at 74. According to Daniel, "[h]ad trial counsel met with Mr. Daniel a reasonable amount of times before his trial, Mr. Daniel would have been able to give Trial Counsel more information about the significant amounts of physical and mental abuse he suffered during his life that Trial Counsel would have presented to the jury." *Id.* at 75.

The ACCA concluded that "in neither Daniel's petition nor his exhibits did Daniel plead what evidence or help he could have provided to his attorneys or how he was prejudiced by their failure to consult with him in a more timely manner." *Daniel*, 86 So. 3d at 417–18. Accordingly, the court determined that Daniel failed to plead facts with specificity and the trial court properly dismissed this claim pursuant to Rule 32.6. *Id.* Moreover, the court reasoned, it could think of "no case establishing a minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance of counsel. Brevity of consultation time between a defendant and his counsel, alone, cannot support a claim of ineffective assistance of counsel." *Id.* at 418 (quotation marks and citations omitted). Because the ACCA's ruling relied on a prejudice determination and a Rule 32.6 deficiency finding, the ruling was on the merits and

is subject to AEDPA review by this court.

First, the court finds that it was not unreasonable for Daniel's attorney not to present a great deal of mitigating evidence to the jury during the guilt phase of the trial where the theory of the case was that Jackson, not Daniel, committed the crime. Mitigation evidence would have played little to no role at the guilt phase, where trial counsel focused on inconsistencies in Jackson's story, faults in the police investigation, and Daniel's innocence. The court also notes Daniel's statement in the letter to trial counsel dated February 28, 2003 which reads as follows: "Please be advised it is I who am to stand trial, and, quite frankly, am facing a sentence of such grave seriousness of the death sentence. Not my Mother. That said, it is "I" who you are to remain in communication with, not my mother." T.R. Vol. 12, Ex. B. This letter suggests that trial counsel was, in fact, in touch with Daniel's mother. This court, therefore, finds that the ACCA's determination that Daniel failed to establish that trial counsel performed deficiently simply by virtue of not meeting with Daniel more before his trial was not an unreasonable determination of fact or contrary to or an unreasonable application of Supreme Court precedent.

Even if Daniel were able to establish that trial counsel performed unreasonably by failing to collaborate with him more before the commencement of

his trial, Daniel cannot establish that he was prejudiced by this alleged deficiency. Daniel's trial counsel drew out inconsistencies in Jackson's testimony and the statement he gave to the police, they pointed out on cross-examination that the State's experts could not conclusively state that the shoes found in Daniel's car made the impressions at the crime scene and that Daniel's fingerprints found at the crime scene were only lifted from beer bottles, and trial counsel brought out on cross-examination of Detective Logan that the police waited eight days before searching Daniel's car, which they only did at the request of K.V. Hill. Daniel testified that he saw Jackson wearing the shoes recovered from his car and, most importantly, that he saw Jackson shoot the victims. Moreover, Daniel cannot show how more information about his childhood abuse would have affected trial counsel's theory of the case that Daniel did not commit the murder. Accordingly, the court is unpersuaded that had Daniel's attorneys collaborated with him more on his defense, there is a reasonable probability that the jury would not have found him guilty of capital murder. Thus, the ACCA's determination that Daniel failed to plead how he was prejudiced by trial counsel's alleged failure to collaborate with him on his defense was not an unreasonable determination of fact or contrary to or an unreasonable application of Supreme Court precedent.

### 3.   Failure to Interview Potential Defense Witnesses

### a.   Procedural Default

Respondent argues that Daniel did not plead the following facts to the

ACCA: "Trial counsel made no effort to determine whether the sneakers found in

Daniel's car would have fit George Jackson." Reply p. 46 (doc. 16) (footnote

omitted). Because Daniel did not present this factual claim to the ACCA, the court

finds that this claim has not been exhausted and Daniel is, therefore, barred from

presenting it here. *See* Brief of the Appellant pp. 30–35, C.R. Vol. 19, Tab 49.

### b.   Merits

Daniel argues that "at least one trial witness, Donald Wayne Bass,"

supported Mr. Daniel's statements and corroborated Mr. Jackson's possession of a

gun similar to the ones used in the murders." Habeas Petition p. 76 (doc. 1). As to

Donald Bass, the ACCA found that "[t]he record of Daniel's trial shows that

counsel called Bass as a defense witness. Bass testified that he had seen Jackson

with a gun before the murders." *Daniel,* 86 So. 3d at 419 (footnote omitted).

Accordingly, the court held that "[t]here was no material issue of fact or law that

entitled Daniel to relief in regard to this claim." *Id.* The ACCA's ruling was on the

merits and this claim is, therefore, subject to AEDPA review by this court. *See*

*Borden*, 646 F.3d at 822 n. 44.

As the ACCA correctly noted, trial counsel did call on Donald Bass who

testified that he had in fact seen a gun in Jackson's apartment when he was visiting his sister Julia Farrow who lived in Hill Top Apartments. C.R. Vol. 6, p. 669. Clearly, then, Daniel's trial counsel could not have performed unreasonably if he presented the evidence that Daniel now claims they should have presented. Accordingly, the court finds that the ACCA's finding is not an unreasonable determination of fact.

Daniel further argues that his trial counsel performed deficiently by not interviewing Jackson's parents, Brenda and Haywood King. Habeas Petition p. 76 (doc. 1). Daniel simply states that trial counsel should have spoken with the Kings because they "were instrumental in causing Mr. Jackson to report the shootings to the police and implicate Mr. Daniel in the crime." *Id.* The ACCA held that "Daniel failed to plead that the Kings would have been willing to talk with Daniel's attorneys, given that Daniel's defense was that their son committed the murders. Nor did Daniel plead how he was prejudiced by counsel's failure to speak with the Kings." *Daniel*, 86 So. 3d at 420. Moreover, the court reasoned that "the only information Daniel pleaded counsel failed to obtain was that the Kings convinced Jackson to go to police and the police paid for Jackson to stay in a hotel after he

reported the murders."[11] That information, noted the court, was presented at trial through the testimonies of Sergeant Echols and Jackson, who trial counsel questioned extensively about the inconsistencies in his statements to the police and at trial and about why he delayed in reporting to the police. *Id.* Because the ACCA finding involved a *Strickland* prejudice determination, it was on the merits and subject to AEDPA review by this court.

In the instant habeas petition, Daniel does not argue how the fact that the Kings were instrumental in Jackson's decision to report to the police would have had any bearing on his case. Moreover, Daniel fails to establish how trial counsel's failure to interview the Kings was unreasonable, given that the Kings had in fact encouraged Jackson to report to the police. A reasonable attorney may well have assumed that the Kings would say nothing beneficial to Daniel's case. Accordingly, the court finds that the ACCA's finding was not an unreasonable determination of fact.

Daniel also argues that trial counsel performed deficiently by failing to interview Ashley Contorno, Jackson's girlfriend at the time of the murders. Habeas Petition p. 76 (doc. 1). Daniel claims that Contorno could have provided

---

[11] Daniel does not include the claim about the police paying for Jackson's hotel stay in the instant habeas petition.

the following information: "Mr. Jackson was not the innocent bystander the State portrayed him to be; Mr. Jackson had a short temper and had often bragged to her that he was a member of a gang; Mr. Jackson left South Carolina not simply because his home scene was just rough, but because his family members caught him stealing to support his drug habit; and Ms. Contorno believed Mr. Jackson had a juvenile record." *Id.* at 76–77 (citation, quotation marks, and footnote omitted). Moreover, Daniel claims that Contorno could have provided information that "Jackson told her that after the murders he went back into the victims' apartment and removed evidence of his presence from the crime scene." *Id.* at 77. This, Daniel claims, would have presented evidence of reasonable doubt to the jury.

As to Ashley Contorno, the ACCA reasoned that "[t]he evidence cited above that Daniel asserts counsel was ineffective for failing to present was not admissible at the guilt phase." *Daniel*, 86 So. 3d at 420–21 (citing Rule 608(a), Ala. R. Evid.). The ACCA further noted that Daniel failed to plead "what Jackson removed or changed at the crime scene," and he, therefore, failed to comply with Ala. R. Crim. P. 32.6. *Id.* at 421. Because the ACCA found that Daniel's claim was insufficiently pled under Rule 32.6, the ruling was on the merits and subject to AEDPA review by this court. *See Borden*, 646 F.3d at 812.

130

In his reply brief, Daniel argues that the ACCA unreasonably determined that Contorno's testimony would have been inadmissible, because it would have been admissible to impeach Jackson's contradictory testimony. Reply Brief p. 82 (doc. 23). The ACCA properly concluded that evidence of Jackson's youthful offender status would not be admissible for impeachment evidence under Alabama Rule of Evidence 609(d). And, the ACCA also concluded that Daniel insufficiently pleaded the facts in support of his claim that Contorno could have testified that Jackson went back into the victims' apartment to remove evidence of his presence. *Daniel*, 86 So. 3d at 421. Indeed, Daniel failed to plead what Jackson went back into the apartment to remove or changed. Additionally, Daniel failed to plead that Contorno was available to testify at trial. Accordingly, the court finds that the ACCA's conclusion that Daniel failed to plead the full facts in support of his claim with specificity was not an unreasonable determination of fact.

In the instant habeas petition, Daniel also claims that trial counsel should have interviewed Tim Swift because "Mr. Swift could have provided information about the behavior of Messrs. Jackson and Daniel in the hours before the crime, including whether Mr. Jackson appeared intoxicated or agitated." Habeas Petition p. 77 (doc. 1). As to Tim Swift, the ACCA concluded that "Daniel failed to plead that he had spoken to Swift or that Swift was in possession of any information,

much less favorable information, concerning Daniel or Jackson. Daniel pleaded

conclusions without any specific factual support; therefore, he failed to comply

with the full-fact pleading requirements of Rule 32.6(b), Ala. R. Crim. P." *Daniel*,

86 So. 3d at 421. Because the ACCA based its decision on Alabama Rule of

Criminal Procedure 32.6(b), the decision was on the merits and is, therefore,

subject to AEDPA review by this court. *See Borden*, 646 F.3d at 812.

Daniel fails to plead what information Swift may have had that would have

been helpful to his case. Jackson and Daniel already testified that they had been

drinking and smoking marijuana, so the jury already had evidence that Jackson

was under the influence of drugs and alcohol. Moreover, the court fails to see how

Jackson appearing agitated before the crime would have been helpful to Daniel's

case. Accordingly, the court finds that a reasonable attorney would have declined

to interview Swift understanding that Swift likely had no information helpful to

Daniel's case. Moreover, the court finds that the ACCA finding was not an

unreasonable determination of fact.

In the instant habeas petition, Daniel claims that trial counsel should have

interviewed K.V. Hill to find "information useful for the cross examination of Mr.

Jackson including why Mr. Hill refused to permit Mr. Jackson to remain in his

apartment . . . and why he believed that Mr. Jackson was more than a mere

bystander on the night Mr. Brodie and Ms. McCulloch were killed; and that illegal drugs were found in Mr. Jackson's apartment." Habeas Petition p. 78 (doc. 1) (citation omitted). Daniel also claims that K.V. Hill could have "told Trial Counsel that the police investigating the shootings did not search for the murder weapon in Mr. Daniel's car until several days after the murders." Habeas Petition p. 78 (doc. 1). As to K.V. Hill, the ACCA held that Hill testified that Daniel's temperament seemed normal the night of the murders, "Jackson testified on cross-examination that: 'K.V. Hill said I had something to do with it and he wouldn't rent to me'", and that "[p]olice testimony also established that Daniel's vehicle was not seized until four days after the murders. The alleged omitted evidence was introduced at Daniel's trial." *Daniel*, 86 So. 3d at 422. Thus, the ACCA found, Daniel failed to establish a material issue of fact or law as required by Ala. R. Crim. P. 32.7(d). *Id.* This ruling was on the merits and is, therefore, subject to AEDPA review by this court. *See Borden*, 646 F.3d at 822 n. 4.

Indeed, Jackson did testify on re-direct that K.V. Hill would not rent the apartment to him anymore:

[Government]: Why did you spend the night at Best Western?

[Jackson]: I told the police I was scared. I ain't have no where else to go.

[Government]: Could you have gone back to your apartment?

[Jackson]: Unh-unh.

[Government]: Why not?

[Jackson]: K.V. Hill said I had something to do with it and he wouldn't rent to me.

C.R. Vol. 4, p. 262. Jackson also already testified that he smoked a joint with Daniel. The jury also was already aware through Detective Logan's testimony that police did not search Daniel's car until several days after the murders. Accordingly, the information that Daniel claims his trial counsel should have elicited from K.V. Hill was brought out through other testimony and the ACCA determination was, therefore, not an unreasonable determination of fact.

Additionally, Daniel claims trial counsel should have interviewed "co-workers to determine whether any of them had ever seen Mr. Jackson wearing the sneakers found in Mr. Daniel's car." Habeas Petition p. 78 (doc. 1). As to Jackson's coworkers, the court found that "Daniel failed to identify, by name, any coworker whom counsel should have consulted. Specificity in pleading requires that the petitioner state both the name and the evidence that was in the witness's possession that counsel should have discovered, but for counsel's ineffectiveness." *Daniel*, 86 So. 3d at 422. The ACCA concluded that Daniel failed to meet Rule 32.6's specificity requirements, *id.*, and the finding is, therefore, subject to AEDA

review by this court. *See Borden*, 646 F.3d at 812. In his habeas petition, Daniel does not name any co-workers who would have been available to testify, nor can he attest to whether they had any information whatsoever to offer. Moreover, Daniel testified that the sneakers were not his. The court, thus, finds that the ACCA's ruling was not an unreasonable determination of fact.

Because the court finds that Daniel failed to establish that trial counsel performed deficiently by failing to interview any of the aforementioned potential witnesses, the court need not reach the question of whether Daniel was prejudiced by this alleged performance deficiency. *See Holladay v. Haley*, 209 F.3d 1243, 1248 ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.").

### 4.    Failure to Review State's Evidence

#### a.    Procedural Default

Respondent argues that Daniel alleges a new fact in support of this claim which is "the allegation that trial counsel failed to review the sneakers found in the trunk of Daniel's car prior to trial." Response p. 49 (doc. 16) (footnote omitted). However, in his brief before the ACCA, Daniel argued that "[t]he Second Amended Petition also provides specific detail of Trial Counsel's failure to review

135

the State's evidence before trial, including photographs of the crime scene and the sneakers found in the trunk of Mr. Daniel's car." Vol. 19, Tab 49, p. 35 (citation omitted). Accordingly, the court finds that this factual allegation was fairly presented to the ACCA and this claim is, therefore, not barred from this court's review.

### b.    Merits

Daniel argues that because trial counsel failed to review the state's evidence prior to the commencement of trial, counsel "was forced to review [crime scene photos] at trial over the assistant district attorney's shoulder and make uninformed, on-the-spot objections to their introduction as evidence." Habeas Petition p. 79 (doc. 1) (citation omitted). Moreover, Daniel argues that because of this failure to review the crime scene photos, trial counsel was unable to properly object to the introduction of photos containing the notation "matches Δ's shoe." *Id.* at 80. This notation, argues Daniel, was highly prejudicial to his defense. In his reply brief, Daniel argues that the ACCA improperly concluded that Daniel failed to plead what objection could have been made to introduction of photos of shoes, when Daniel pleaded that such photos were highly prejudicial. Reply Brief p. 82 (doc. 23).

The ACCA held the following:

The record shows that counsel did make several objections to the photographs. Counsel first objected when the photographs were introduced by the prosecutor in bulk. The circuit court sustained that objection and informed the prosecutor that he would have to go through each photograph and specifically identify each one. Counsel also objected and argued that the prosecutor failed to prove a proper foundation for the admission of the photographs. This objection was overruled. Jay Logan, a State evidence technician testified that the shoes recovered from Daniel's car could not be ruled out as a source of the shoe prints recovered at the murder scene. On cross-examination, Logan admitted that he could not conclusively say whether the shoes recovered from Daniel's car were the source of the shoe prints at the murder scene. Also, the most damaging evidence concerning the shoes was not the shoe prints found at the murder scene but the facts that the shoes recovered from Daniel's car had blood on them that matched the victims' blood and were the same size as shoes seized from Daniel's apartment. Jackson had testified that he owned one pair of shoes and that he was wearing those shoes when he talked to the police.

*Daniel*, 86 So. 3d at 423 (citations omitted). The court further concluded that

"Daniel failed to plead what objection counsel could have made that would have

resulted in the shoe prints being excluded." *Id.* Moreover, reasoned the court,

Daniel failed to plead what objection counsel could have made to the notation on

the photograph "matches defendant's shoe." *Id.* The ACCA concluded that this

claim was properly dismissed by the trial court according to Rule 32.6(b).

Accordingly, as a Rule 32.6(b) determination, the ACCA's finding was on the

merits, and it is, therefore, subject to AEDPA review by this court.

Because Daniel's trial counsel did object to the introduction of the photos,

because Forensic Scientist John Case testified that he could not conclude that the shoes recovered from Daniel's car made the imprints at the crime scene, and because Daniel testified that the shoes were not his, the court finds that the ACCA ruling is not an unreasonable determination of fact. Even assuming, however, that trial counsel performed deficiently by failing to review the state's photos and the sneakers found in the car prior to trial, Daniel cannot establish that such failure prejudiced him. Forensic scientist John Case testified that he could not say with certainty that the shoe found in Daniel's car was the one that made the imprints at the crime scene. Daniel testified that the shoe belonged to Jackson. Daniel fails to establish what additional evidence could have been brought forth through prior review of the state's evidence. Even if it were error to admit the photograph with the notation "matches Δ's shoe," trial counsel countered this evidence by introducing evidence through Daniel's testimony that the shoes were not his. Further, trial counsel elicited from Detective Case testimony that he could not conclusively say that the shoe recovered from the car made the imprints at the crime scene. Accordingly, Daniel cannot establish that had counsel reviewed the state's photos and the sneaker prior to trial, there is a reasonable probability that the jury would not have found him guilty of capital murder.

**5.     Failure to Procure Necessary Police Procedures and DNA**

## Experts

Daniel argues that "[i]n the Rule 32 proceedings, the CCA affirmed the circuit court ruling that Trial Counsel had not been ineffective for failing to procure the assistance of a police procedures expert because Daniel failed to plead that Mr. Katsaris was qualified to testify as an expert." Reply Brief p. 86 (doc. 23). Daniel further argues that "The CCA conclusion that Petitioner failed to plead Mr. Katsaris's qualifications to serve as an expert on generally accepted police procedures is an unreasonable determination of the facts in light of the record before it." *Id.* Daniel also claims that the ACCA's determination that Daniel failed to plead by name any forensic or DNA expert who could have testified at Daniel's trial or the content of the expert's testimony was an unreasonable application of *Strickland* because Daniel was never given the opportunity to conduct discovery on the shoes. Reply Brief p. 87 (doc. 23).

As to counsel's failure to obtain the services of a police procedures expert, the ACCA found that "Daniel failed to plead that the Florida expert [W. Kenneth Katsaris] was familiar with Alabama police practices and that he was available to testify in Alabama in 2003." *Daniel*, 86 So. 3d at 424. The court further concluded that "in Daniel's case-in-chief, counsel also called Sgt. Cynthia Echols of the Birmingham Police Department to testify. Sgt. Echols testified that at the time of

the murder she was a homicide detective and that she was the lead homicide

detective on Daniel's case. Counsel questioned Sgt. Echols about the

investigation. Counsel used every opportunity to attack the police investigation

and conduct a thorough cross-examination of the State's forensic expert." *Id.* at

425. The ACCA found that Daniel failed to meet Rule 32.6(b)'s specificity

requirement and he failed to establish a material issue of law or fact under Rule

32.7. This finding was on the merits and is, therefore, subject to AEDPA review

by this court. *See Borden*, 646 F.3d at 812, 822 n. 4.

     As to counsel's failure to obtain the services of a DNA expert, the ACCA

held that "Daniel failed to identify, by name, any forensic or DNA expert who

could have testified at Daniel's trial or the content of the expert's expected

testimony." *Id.* at 425. The court further noted that "how to deal with the

presentation of an expert witness by the opposing side, including whether to

present counter expert testimony, to rely upon cross-examination and/or to forgo

development of certain expert opinion, is a matter of trial strategy which, if

reasonable, cannot be the basis for a successful ineffective assistance of counsel

claim." *Id.* at 426 (quoting *Thomas v. State*, 284 Ga. 647, 650, 670 S.E. 2d 421

(2008)). The ACCA's finding that Daniel failed to meet Rule 32.6's specificity

requirement was on the merits and is, therefore, subject to AEDPA review by this

court. *See Borden*, 646 F.3d at 812.

Daniel did plead that Katsaris "would have been available to testify at Mr. Daniel's trial." C.R. Vol. 19, Tab 49, pp. 45–46. However, because Daniel failed to plead that Katsaris was familiar with Alabama police procedures, the court finds that the ACCA ruling was not an unreasonable determination of fact. *See id.* Additionally, Daniel failed to plead with specificity any DNA expert who would have been willing and available to testify at Daniel's trial. Accordingly, this court finds that the ACCA's ruling was not an unreasonable determination of fact. Moreover, because Daniel did not establish that Katsaris was an expert in Alabama police procedures or was willing and available to testify on Alabama police procedures, and because Daniel did not plead any DNA expert who would have been willing and available to testify, Daniel cannot establish that had his counsel pursued such testimony, there is a reasonable probability that the jury would not have found him guilty of capital murder.

### 6.    Failure to Conduct Adequate Voir Dire

#### a.    Procedural Default

Respondent argues that Daniel asserts new facts in support of his claim that "Juror Ernestine Cooper's background 'likely colored her view of Mr. Daniel.'" Response pp. 54–55 (doc. 16) (footnote omitted). However, in his brief before the

ACCA, Daniel pleaded that "[a]s a result of their inadequate voir dire, Trial Counsel permitted a woman to be empanelled on the jury whose background likely colored her view of Mr. Daniel." C.R. Vol. 19, Tab 49, p. 52. Accordingly, Daniel fairly presented this factual allegation before the ACCA, and it is, therefore, not barred from this court's review.

### b.      Merits

Daniel argues that "a reasonable attorney in Trial Counsel's position would have concluded that juror Cooper's life experience was such that it would be likely to prevent or substantially impair the performance of her duties as a juror in accordance with instructions and her oath." Habeas Petition p. 87 (doc. 1) (citation and quotation marks omitted). Daniel further argues that "Trial Counsel's failure to challenge Ms. Cooper's presence on the jury or ask her whether she would be able to render an impartial verdict in a case where rape might be an issue was patently unreasonable." *Id.*

As to this claim, the ACCA found that although trial counsel "did not ask the question of the prospective juror, the juror was asked about whether she could be impartial in this case." *Daniel*, 86 So. 3d at 426. The court concluded that "Daniel failed to plead that E.C. was [not] impartial [sic]; therefore, he failed to comply with the pleading requirements of Rule 32.6(b), Ala. R. Crim. P." *Id.* at

427.[12] This ruling was on the merits and is, therefore, subject to AEDPA review by this court. *See Borden*, 646 F.3d at 812.

This court first notes that *trial counsel*, Danita Haskins, not the State prosecutor, did ask the jurors if their past experience with crimes would affect their ability to be impartial: "Let me ask you specifically before we go over here. The fact that either you or a family member has been a victim of a crime, would that affect you – would that cause you to have more sympathy in this case, or some sympathy in this case, about the victims in this case, in such a way it will affect the way you decide this case?" C.R. Vol. 3, Tab. 4, pp. 80–81. Ms. Cooper did not respond that her past experience with rape would affect the way she decided the case. Later during voir dire, trial counsel again asked jurors if they could be impartial: "Now for all of you who did not say, the fact that you have been victims or you have had family members who've been victims of crime, would that affect you or make you have more sympathy with the victims in this case?" *Id.* at 84. Again, Juror Cooper did not respond.

Additionally, several other jurors testified that they or their family members were victims of robberies or burglaries, other crimes similar to those committed by

---

[12] The ACCA referred to juror Cooper as E.C. in its opinion. Because Daniel refers to juror Cooper by name in his habeas petition, the court refers to her by name as well.

Daniel in the past. Juror Atkins testified that his wife was robbed while she was managing a shoe store. C.R. Vol. 3, Tab 4, p. 79. Juror Goins testified that her daughter was murdered at the age of 15, a crime that remained unsolved, and that she had been robbed while working as the manager of a fast food restaurant. *Id.* at 81. Juror Lucas was the victim of a burglary at his home *Id.* at 83. Yet all of these individuals were admitted to the jury. *Id.* at 143. The court fails to see why Ms. Cooper's past experience would cloud her vision any more than the other jurors who had experienced crimes similar to those committed by Daniel in their pasts as well. If Juror Goins, whose daughter's murder remained unsolved at the time, could rule impartially in Daniel's capital murder case, the court sees no reason why juror Cooper could not be impartial as well. Accordingly, this court finds that the ACCA's finding that juror Cooper was asked about whether she could be impartial is not an unreasonable determination of fact nor is it contrary to or an unreasonable determination of federal law.

Additionally, Daniel cannot establish prejudice as a result of trial counsel's failure to strike juror Cooper. Because other jurors were impacted by crimes similar to those committed by Daniel and because, despite being asked, Ms. Cooper gave no indication that she could not rule impartially in Daniel's case, there is no reasonable probability that had juror Cooper been stricken, the jury

would not have convicted Daniel of capital murder.

### 7. Failure to Adequately Address Jackson's Testimony

Daniel argues that "[u]nder Section 12-21-222 of the Alabama Criminal Code, a felony conviction may not be maintained on the uncorroborated testimony of an accomplice and other evidence showing only the circumstances of the offense or that the offense was committed." Habeas Petition p. 88 (doc. 1) (citation omitted). Daniel argues that a reasonable attorney would have concluded that Jackson could have been charged as an accomplice or co-conspirator to the crimes and, therefore, "should have objected to the introduction of Mr. Jackson's testimony without corroboration." *Id.* at 89. Daniel argues that "because there is not a single piece of reliable evidence that corroborates Mr. Jackson's testimony that the murders were committed by Mr. Daniel–all of the forensic evidence is neutral; it does not tend to incriminate Mr. Daniel any more than it does Mr. Jackson–here can be no doubt that the outcome of Mr. Daniel's trial would have been different. Indeed, the sole proof advanced by the State of Mr. Daniel's guilt was Mr. Jackson's testimony." Habeas Petition p. 89 (doc. 1).

As to counsel's alleged failure to argue that Jackson's testimony was not adequately corroborated, the ACCA held that "the trial court correctly found, as a matter of law, that Jackson was not an accomplice. Accordingly, the State was not

required to corroborate Jackson's testimony." *Daniel*, 86 So. 3d at 427. The court

also quoted its prior decision affirming Daniel's conviction wherein it noted that,

although it was not required to do so, the State had presented sufficient evidence

to corroborate Jackson's testimony:

> Specifically, evidence regarding the location of the victim's bodies;
> Farrow's testimony about the number and timing of gunshots; evidence
> that blood that matched McCulloch's blood profile was on a tennis shoe
> that officers recovered from the trunk of a vehicle that appellant had had
> towed to the apartments; evidence that the tennis shoe was the same size
> as other shoes officers recovered from the appellant's apartment;
> evidence that there were two shoe impressions in the victims' apartment
> that were consistent with that tennis shoe; evidence regarding the
> number and locations of shell casings and projectiles; evidence that all
> of the shell casings and projectiles were fired from the same handgun;
> and evidence that the handgun used was probably a .380 semiautomatic
> corroborated Jackson's testimony.

*Id.* at 427. The court further reasoned that "[b]ecause the substantive claim

underlying the claim of ineffective assistance of counsel has no merit, counsel

could not be ineffective for failing to raise this issue." *Id.* (citations omitted). The

ACCA concluded that Daniel failed to establish a material issue of fact or law that

would entitled to him to relief as required by Rule 32.7. This ruling was, therefore,

on the merits and subject to AEDPA review by this court. *See Borden*, 646 F.3d at

822 n. 4.

The ACCA finding is not an unreasonable determination of fact or contrary

146

to or an unreasonable application of federal law. Contrary to Daniel's contention, the State did not simply rely on Mr. Jackson's testimony in building its case. Rather, the State also advanced plenty of circumstantial evidence; the incriminating shoe was found in Daniel's car after all. Moreover, Daniel took the stand in his own defense and testified that Jackson committed the murders and that he did not. The jury credited Jackson's testimony over Daniel's. Accordingly, the ACCA's determination that Jackson's testimony was adequately corroborated through circumstantial evidence was not an unreasonable determination of fact. Thus, the court's finding that counsel was not ineffective for failing to challenge the introduction of Jackson's testimony was also not an unreasonable determination of fact or contrary to or an unreasonable application of Supreme Court precedent. Because this court finds that trial counsel did not perform deficiently by failing to adequately address Jackson's testimony, the court need not reach the question of whether Daniel was prejudiced by this alleged deficiency. *See Holladay*, 209 F.3d at 1248 ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.").

### 8.  Failure to Secure Admission of Impeachment Evidence

In his habeas petition, Daniel claims that trial counsel never impeached Jackson with the record or transcript, but relied on Echol's handwritten notes and that the ACCA finding was thus an unreasonable determination of the facts. Reply Brief p. 93 (doc. 23). Daniel argues that because trial counsel never authenticated the audio recording or the transcript of the recording, trial counsel was unable to secure the admission of that evidence and, therefore, "unable to cross examine him effectively concerning inconsistencies between his trial testimony and his statement to the police." *Id.*

As to this claim, the ACCA concluded that "Daniel's counsel had the audiotape of Jackson's interview transcribed and impeached Jackson with the discrepancies in his statement to the police." *Daniel*, 86 So. 3d at 427. Trial counsel called Sgt. Echols  to testify about the inconsistencies in Jackson's trial testimony and testimony to the police. *Id.* at 428. The court further noted that trial counsel called Donald Bass to testify that he had seen Jackson with a gun several weeks before the murder, which contradicted Jackson's testimony that he did not own a gun. *Id.* at 428. The court concluded that counsel's use of "the printed transcript of Jackson's interview instead of the audiotaped version did not render counsel's performance ineffective. Relief was correctly denied on this claim because there was no material issue of fact or law that would entitle Daniel to

relief." *Id.* Because the ACCA's determination rests on a finding that Daniel

asserted no material issue of fact or law, this ruling is on the merits and is,

therefore, subject to AEDPA review by this court. *See Borden*, 646 F.3d at 822 n.

44.

Daniel is correct that the ACCA incorrectly found that "Daniel's counsel

had the audiotape of Jackson's interview transcribed and impeached Jackson with

the discrepancies in his statement to the police." *Daniel*, 86 So. 3d at 427.  Trial

counsel in fact had trouble getting their transcript admitted into the record and

were unable to introduce either the transcript or the recording of Jackson's

interview. C.R. Vol. 4 pp. 273–74, 286–89.

Nevertheless, the ACCA's finding that Daniel's claim is meritless is not an

unreasonable determination of fact or contrary to or an unreasonable application of

Supreme Court precedent because Daniel cannot establish that he was prejudiced

by trial counsel's failure to cross-examine Jackson with the transcript. Rather, trial

counsel pointed out various inconsistencies in Jackson's testimony. Daniel claims

that "[i]f the jury had heard the only reliable recording of Mr. Jackson's statements

that existed, they would have heard the many significant inconsistencies between

it and his testimony at trial." Habeas Petition p. 91 (doc. 1). Daniel points to four

inconsistencies that had they been brought to the jury's attention, there is a

reasonable probability that the jury would not have convicted him of capital

murder. The State prosecutor, however, pointed out at least three of these

inconsistencies in Jackson's testimony during his cross-examination of Echols:

> [Prosecutor]: Okay. But as far as I can tell there are only two things that
> were different. Is that right?
>
> [Echols]: Yes, sir.
>
> [Prosecutor]: Did you mean there was a major difference between him
> saying that he heard Loretta screaming when he went by, walked by her
> front door, and he heard her screaming when he had gotten into his
> apartment?
>
> [Echols]: That was one of the differences.
>
> [Prosecutor]: That was a difference?
>
> [Echols]: Where he actually said he had heard it outside – while he was
> outside versus when he was on the inside of his apartment.
>
> [Prosecutor]: And the other major difference was that he had seen the
> gun before they got to the apartment?
>
> [Echols]: Yes.
>
> [Prosecutor]: Those are the only two differences?
>
> [Echols]: Yes, sir.
>
> [Prosecutor]: Two. Then, I guess, there was something about whether he
> saw the fire and the blood coming out of the gun or whether he heard the
> shots?
>
> [Echols]: Right.

[Prosecutor]: So three. We'll say three differences. That's differences between what he said to you the morning after witnessing two people being brutally murdered, and what he said yesterday in court a year and five months–almost a year-and-a-half later.

C.R. Vol. 6, p. 651–52.

Moreover, trial counsel impeached Jackson by pointing out inconsistencies in Jackson's testimony during cross-examination:

[Jackson]: I was in the doorway on the front step. I seen blood and fire.

[Trial Counsel]: Okay. You didn't tell the detective you saw blood and fire; did you?

[Jackson]: No, sir, I don't believe so. It's irrelevant. He shot the people.
. . . .

[Trial Counsel]: And it's your testimony that you saw that then, but you didn't tell the officers that you saw that in your statement; did you?

[Jackson]: Nah.

[Trial Counsel]: Is there any reason you didn't tell the officers that you actually saw the shots rather than heard the shots back the day after it happened?

[Jackson]: No, sir, 'cause I didn't feel like it had nothing to do with it.

C.R. Vol. 4, pp. 242–44.

[Trial Counsel]: So to make sure I understand what you just testified to, you were afraid that he would kill you, you went to your apartment, you locked the door, you put a bed up to it, but when he came back to your apartment, you moved the bed, you unlocked the door and you let him in?

[Jackson]: Yes, sir.

[Trial Counsel]: All right. At any time did Renard threaten you?

[Jackson]: No. That's why I let him in the door so he wouldn't threaten me. Wouldn't give him no reason to threaten me.

[Trial Counsel]: But you locked the door because you were afraid he was going to try to come in.

[Jackson]: Yeah.

[Trial Counsel]: You had just seen him kill two other individuals and you go and lock your door because you are afraid but you let him in so he wouldn't kill you?

[Jackson]: Yeah. I didn't want to not let him in and him force and come there anyway and kill me. So I let him in there, you know what I'm saying, see everything's all right.

*Id.* at 245–46.

Thus, Daniel cannot establish that trial counsel's performance fell below an objective standard of reasonableness. Because the court finds that trial counsel did not perform deficiently in impeaching Jackson's testimony, the court need not reach the question of whether Daniel was prejudiced by this alleged deficiency. *See Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.").

### III.    SPECIFIC CLAIMS OF APPELLATE COUNSEL'S INEFFECTIVE ASSISTANCE

Daniel argues that appellate counsel was deficient by relying on the trial transcript instead of doing an independent investigation into trial counsel's inadequate performance and failing to raise the issues included in the habeas petition. Habeas Petition p. 93 (doc. 1). Daniel further claims that "Trial Counsel's failure to call witnesses during the penalty phase was easily discernible from the trial transcript, and Appellate Counsel's failure to properly raise this issue with the Circuit Court on their own initiative is objectively unreasonable." *Id.* at 95. Moreover, Daniel claims that "[i]n spite of the many instances of ineffective assistance of counsel identified in the state post-conviction petition that are described above, Appellate Counsel failed to raise a single other claim of ineffective assistance during the hearing on his motion for a new trial or an appeal, the basis of which could have been identified from a review of the record." *Id.*

As to Daniel's claim of ineffective assistance of appellate counsel, the ACCA noted that Daniel's appellate counsel "filed the motion for a new trial in June 2003, before the record was certified as complete." *Daniel*, 86 So. 3d at 440. At the hearing on the new trial, appellate counsel "indicated that he had part of the record, but not the entire record." *Id.* The ACCA concluded that "[g]iven the time

153

constraints and the fact that counsel was dealing with a complicated death-penalty case, new counsel could not reasonably have been expected to argue that his trial counsel was ineffective at the motion for a new trial hearing." *Id.* at 441. Moreover, the court noted "Counsel was not ineffective for failing to raise the extensive claims of ineffective assistance of counsel that postconviction counsel, with his time and resources, raised in his Rule 32, Ala. R. Crim. P., petition." *Id.* The ACCA found that Daniel failed to comply with Rule 32.6(b)'s specificity requirements, and the ruling is, therefore, subject to AEDPA review by this court. *See Borden*, 646 F.3d at 812.

Daniel alleges no facts contrary to the ACCA's finding that appellate counsel filed the motion for a new trial before the record was certified. Additionally, under § 2254(e)(1), "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Therefore, because Daniel has produced no facts to rebut the ACCA's factual determinations, this court finds that the ACCA's determination that appellate counsel did not perform deficiently by failing to raise the extensive

154

ineffective assistance of counsel claims raised in Daniel's Rule 32 petition is not unreasonable determination of fact.

## III.   DANIEL'S REQUEST FOR DISCOVERY AND EVIDENTIARY HEARING

"Generally, '[a] habeas petitioner . . . is not entitled to discovery as a matter of ordinary course,' but may obtain leave of court to conduct discovery pursuant to 'Rules Governing Section 2254 Cases' upon showing 'good cause,' *Bracy [v. Gramley,]* 520 U.S. at 904, 117 S. Ct. at 1796–97 [(1997)], and diligence in pursuing the claim for which discovery is sought, consistent with 28 U.S.C. § 2254(e)(2). *Issacs v. Head*, 300 F.3d 1232, 1249 (11th Cir. 2002). Good cause is demonstrated 'where specific allegations . . . show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he . . . is entitled to relief.' *Bracy*, 520 U.S. at 908–09, 117 S. Ct. at 1799 (quoting *Harris v. Nelson*, 394 U.S. 286, 300, 89 S. Ct. 1082, 1091, 22 L. Ed. 2d 281 (1969))." *Arthur v. Allen*, 452 F.3d 1234, 1247 (11th Cir. 2006). "Before addressing whether [a] petitioner is entitled to discovery . . . to support his . . . claim, [a court] must first identify the 'essential elements' of that claim." *Bracy v. Gramley*, 520 U.S. at 904 (citing *United States v. Armstrong*, 517 U.S. 456, 468 (1996)). The court then must "turn to the question whether petitioner has shown 'good cause' for

appropriate discovery to prove his . . . claim." *Id.* at 905–06. Moreover, Rule 8(a) of the Habeas Rules states that "[i]f the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any material submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Rules Governing § 2254 Cases, Rule 8(a), 28 U.S.C. § 2254.

Having outlined the factual and legal elements supporting Daniel's claims in the rest of this opinion and finding those claims meritless, this court finds that Daniel has failed to establish good cause on the claims in his habeas petition to warrant discovery. Additionally, because this court finds Daniel's habeas petition is due to be dismissed, the court also finds Daniel's request for an evidentiary hearing is due to be denied.

## <u>CONCLUSION</u>

For all the reasons set forth herein, Daniel's petition for writ of habeas corpus is due to be DISMISSED, or in the alternative DENIED. A separate order in accordance with this Memorandum Opinion will be entered.

DONE and ORDERED this the 27th day of March 2014.


_____

<u>INGE PRYTZ JOHNSON</u>

<u>SENIOR U.S. DISTRICT JUDGE</u>